# THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **PHILIP THOMAS**<br>**p/k/a "Cutty Ranks"** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION FILE** |
| ) | **NO.:** |
| **ULTRA MUSIC PUBLISHING EUROPE** ) | |
| **AG d/b/a SONY MUSIC** ) | |
| **ENTERTAINMENT** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## COMPLAINT FOR BREACH OF CONTRACT AND ACCOUNTING

COMES NOW, PHILLIP THOMAS p/k/a "Cutty Ranks" (hereinafter "Plaintiff") and file this Complaint and Temporary Restraining Order against ULTRA MUSIC PUBLISHING EUROPE AG d/b/a SONY MUSIC ENTERTAINMENT, (hereinafter "Defendant") and show this Honorable Court the following:

## FACTS

1.

Plaintiff is a world wide known musician with Reggae music dating back to the 1980's ("Cutty Ranks").

2.

Defendant Ultra Music Publishing Europe AG dba Sony Music

Entertainment ("Sony") can be served at its principal office located at 137 W 25th

Street FL 10 New York, NY 10004-7209.

3.

Venue is proper under the terms of the Contract.

4.

Plaintiff and Defendant signed two agreements, the first one is a Co-

Publishing Agreement ("Co-Publishing Agreement") (Attached Exhibit "A") and

the second is an Administration Agreement ("Administration Agreement")

(Attached Exhibit "B") on July 18, 2018.

**First Contract**

5.

Plaintiff agreed to assign 50% of his right, title and interest in and to the

musical compositions  as Writer to Defendant in the musical compositions:

**Introduccion B-El Cosita Mix**, **La Cripta Remixes Cutty Ranks Y El Chombo**,

and New **Version 2018 Dame Tu Cosita ("Dame Tu Cosita Musical Compositions")**.

6.

Plaintiff agreed to grant Defendant 100% right to the administration, collection, promotion and enforcement of the Dame Tu Cosita Musical Compositions.

7.

Defendant, under the Co-Publishing Agreement was to remit Plaintiff Seventy-five percent (75%) of all Net Sums received by Publisher under any mechanical, transcription, print or other license or from any other source in respect of the Dame Tu Cosita Musical Compositions.

8.

Defendant, under the Co-Publishing Agreement, was to remit Plaintiff Sixty-five percent (65%) of all Net Sums received by Publisher for Cover Recordings and synchronization licenses with respect to the Dame Tu Cosita Musical Compositions.

9.

Defendant, under the Co-Publishing Agreement, was to remit Fifty-percent (50%) of all Net Sums comprising publisher's share of public performance income

and Twenty-Percent (20%) of public performance of Cover performances with respect to the Dame Tu Cosita Musical Compositions.

10.

Defendant, under the Co-Publishing Agreement, was to remit Seventy-percent (75%) of all Net Sums of all amounts not covered in the foregoing paragraphs with respect to the Dame Tu Cosita Musical Compositions.

11.

Defendant, under the Co-Publishing Agreement was to provide an accounting of the royalty statement to Plaintiff but has failed to do so.

13.

Plaintiff, under the Co-Publishing Agreement, was paid a $75,000.00 advance.

14.

Dame Tu Cosita hit No. 36 on the Billboard Hot 100 and sold thousands of downloads in the first week and has surpassed 5 billion view on Youtube fueled by the dancing green alien video.

15.

To date, Defendant has not paid Plaintiff under the Co-Publishing Agreement.

**Second Contract**

16.

Plaintiff and Defendant signed an Administration Agreement on July 18, 2018.  (Attached Exhibit "B")

17.

Under the Administration Agreement, Plaintiff licensed, granted, and assigned to Defendant the exclusive right to from January 1, 2019 to each and every musical composition which is initially composed owned or controlled by Plaintiff set forth on the Schedule A. The Schedule A only states [TBC].

18.

Defendant, under the Administration Agreement was to remit eighty-five percent (85%) of all Net Sums to Plaintiff received by Defendant under any mechanical, transcription, print or other license or from any other source reduced to seventy-five percent (75%) for Covers.

19.

Defendant, under the Co-Publishing Agreement, was to remit Plaintiff seventy-five percent (75%) of all Net Sums received by Publisher for Cover Recordings and synchronization licenses.

20.

Defendant, under the Co-Publishing Agreement, was to remit Plaintiff seventy percent (70%) of all Net Sums received by Publisher comprising of 'publisher's share' of public performances royalties.

21.

On April 22, 2025, Plaintiff mailed a Notice of Default and Demand for Audit seeking full compensation under the Agreement.  (See Exhibit C).

22.

To date, Plaintiff has not received any payment or audit documentation.

## COUNT I

## BREACH OF CONTRACT

23.

All previous paragraphs are incorporated as if set forth verbatim herein.

24.

Plaintiff and Defendant had an Agreement for Defendant to provide certain percentages of Net Sums received under the Agreement.

25.

Defendant has failed to remit such sums and has failed to provide an Accounting of such sums.

As a result of the failure of Defendants to perform the terms, conditions, and obligations under the Co-Publishing Agreement and Administration Agreement, Plaintiff has suffered substantial damages to be determined at trial.

## COUNT II
## ACCOUNTING

26.

All previous paragraphs are incorporated as if set forth verbatim herein.

27.

Defendant, as Co-Publisher and Administrator, served in a fiduciary and confidential capacity charged with collecting funds on behalf of Plaintiff and administering those funds.

28.

Plaintiff is entitled to an accounting of all Net Sums received on behalf of Plaintiff by Defendant.

29.

As a result of the failure of Defendants to perform the terms, conditions, and obligations under the Co-Publishing Agreement and Administration Agreement, Plaintiff has suffered substantial damages to be determined at trial.

## COUNT III
## ATTORNEYS FEES

30.

All previous paragraphs are incorporated as if set forth verbatim herein.

31.

Defendants have acted in bad faith, has been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expense.  Consequently, pursuant to New York laws and the Agreement, Plaintiff should be paid her expenses of litigation, including attorney's fees in an amount to be determined at trial.

**WHEREFORE, Plaintiff prays as follows:**

(a)    That Plaintiff have a jury of 12;

(b)    That the Plaintiff receive damages on Counts I in an amount determined by the jury but in no event no less than $3,000,000.00.

(c)    That the Court award attorney's fees to Plaintiff incurred in bringing this action against Defendants; and

(d)    That the courts order any and all such further relief under law and equity.

Respectfully submitted this 24th day of March 2026

/s/ Catherine Gibson

CATHERINE GIBSON

Attorney for Plaintiff

Georgia Bar No.141342

THE GIBSON LAW FIRM, LLC

**1126 Ponce de Leon Ave, NE**

**Atlanta, GA  30306**

**tel (404) 733-6700; fax (404) 733-6007**

# EXHIBIT "A"

CO-PUBLISHING AGREEMENT (the "Agreement"), made as of this 18th day of July, 2018 by and Philip Thomas p/k/a "Cutty Ranks" and his affiliated publishing designee (BMI), having an address 5 Wickham Drive, Kingston 8, St. Andrew, Jamaica, West Indies (hereinafter referred to as "Writer") -with- Ultra Music Publishing Europe AG, having an address at C/o Sony Music Entertainment, Letzigraben 89 CH – 8003, Zurich, Switzerland (hereinafter referred to as "Publisher").

WHEREAS, Writer owns and/or controls the copyrights and all other rights in certain musical compositions as more particularly set forth herein; and

WHEREAS, Publisher is engaged in the business of music publishing or is in a position to arrange for music publishing in the Territory (as defined below).

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties hereinafter made by the parties hereto, Writer and Publisher hereby agree as follows:

1.    Rights Granted.

(a)    With effect from 1st January 2021 (the "Effective Date") Writer hereby irrevocably and absolutely assigns, conveys and grants to Publisher, its successors and assigns, an undivided fifty percent (50%) of all of Writer's right, title and interest (including without limitation any ownership, control and administration interest) (Writer's right, title and interest as aforesaid hereinafter defined as "Writer's Interest") in and to to those musical compositions set forth on Schedule "A" (and any and all versions, adaptations and derivatives thereof) attached hereto and made a part hereof, including but not limited to the titles, lyrics and music of each such musical composition and all worldwide copyrights therein and renewals and extensions thereof under any present or future laws throughout the Territory in perpetuity. Such musical compositions are hereinafter referred to as "Compositions" and each as a "Composition." Writer hereby represents and warrants that no royalties or other sums have been paid to or on behalf of Writer in respect of the Compositions set forth on Schedule "A" as of the date hereof and that mechanical royalties for such Compositions shall be collectible by Publisher for the United States and Canada at not less than seventy-five percent (75%) (prorated by Writer's Interest in each case) of the prevailing statutory per selection mechanical rate in the applicable territory.

(b)    With effect form the Effective Date, Writer hereby irrevocably assigns, conveys and grants to Publisher, its successors and assigns, for the period commencing on the date hereof and continuing in perpetuity the sole and exclusive perpetual rights of administration, collection, promotion and enforcement throughout the Territory in and to one hundred percent (100%) of Writer's Interest in and to each Composition hereunder (including, without limitation, Writer's retained share of the copyright in the Compositions), such rights including, without limitation:

(i)    The exclusive right to perform and license others to perform the Compositions publicly or privately, for profit or otherwise, by means of public or private performance, radio broadcast, television, or by any other means or media, whether now known or hereafter devised, and to collect all royalties and fees payable by reason thereof;

(ii)    The exclusive right to make or cause to be made, and to license other Persons to make, phonograph records, master recordings, transcriptions, soundtracks, pressings and any other mechanical, electrical, digital or other reproductions of the Compositions, in whole or in part (including the right, subject to prior written consent of Writer, to grant licenses to other Persons authorizing so-called "sampling" and/or interpolation of the Compositions), and to use, manufacture, advertise, market, license, sell, or otherwise exploit such reproductions for any and all purposes, including, without limitation, private and public performances, radio broadcast, television, motion pictures, phonograph records, exploitations via the Internet, wireless networks and any and all other means and devices whether now known of hereafter devised, and to collect all monies (including, without limitation, royalties, advances and fees) payable in connection therewith. Without limiting the foregoing, Publisher shall be entitled to grant reduced rate mechanical licenses to record companies in accordance with so-called "Controlled Compositions" clauses provided that Publisher shall not, without Writer's prior written consent, grant any Person a mechanical license at less than seventy-five percent (75%) of the prevailing minimum statutory rate in the territory concerned, and with "caps" in place of less than ten (10) musical compositions per full length album;

(iii)    (A) Subject to reasonable consultation with Writer, the exclusive right to grant worldwide (or lesser territory) licenses for the recording and synchronization of the Compositions, for any and all purposes, in any and all audiovisual works and devices, including, without limitation, motion pictures, TV programs, films, videos and commercials and any and all other means and devices, whether now known or hereafter devised, and to collect all monies payable by reason thereof;

(B)    Notwithstanding the foregoing, Publisher agrees to obtain Writer's written consent prior to embodying Compositions in paid political or religious advertisements, advertisements promoting tobacco, firearm, ammunition products, personal hygiene products or enhancement products, or any audiovisual work which has been or is expected to be rated "NC-17" by any duly authorized regulatory body having jurisdiction over such matters (e.g., MPAA).

(iv)    The exclusive right to print, publish, sell and multiply, and to authorize other Persons to print, publish, sell and multiply, copies of the Compositions in all forms, including, without limitation, sheet music, orchestrations, arrangements and other editions of the Compositions, separately or together with other musical compositions, including, without limitation, in song folios, compilations, song books, mixed folios, personality folios and lyric magazines, with or without music, and to collect all monies payable by reason thereof;

(v)    The exclusive right to make or authorize other Persons to make any arrangement, adaptation, translation, dramatization or transposition of any of the Compositions or of the titles, lyrics, or music thereof, in whole or in part, and in connection with any other musical, literary or dramatic material, and to prepare or authorize derivative works based on the Compositions, regardless of any so-called "moral rights," or similar rights, and to collect all monies payable by reason thereof. Publisher will not make or authorize any material changes to any Composition without Writer's prior written approval (excluding faithful

2

translations and the authorization of remixed versions of Compositions which do not alter the fundamental character of the applicable Composition);

       (vi)    The exclusive right to secure copyright registration and protection of the Compositions in Publisher's and Writer's names, including any and all renewals and extensions of such copyright under any present or future laws throughout the Territory, and to have and to hold said copyrights, renewals and extensions and all rights existing thereunder for and during the full term of said copyrights and all renewals and extensions thereof. Writer shall execute and deliver to Publisher copyright assignments, authorizations and directions for Writer's Interest in and to each of the Compositions, such assignments, authorizations and directions to be in the form of Exhibit "A", attached and made a part of this Agreement;

       (vii)    The exclusive right to sublicense any or all of the rights granted herein to any Person;

       (viii)    The exclusive right to collect all monies derived from the exploitation of the Compositions from any and all sources, including both the so-called publisher's share and the writer's share of such monies (excluding only the writer's share of public performance income which may be paid directly to the writers of the Compositions); and

       (ix)    All other rights of exploitation, administration, promotion and collection in and to the Compositions and each of them.

       (c)    Writer hereby grants to Publisher the right to use the name, Writer approved likeness and Writer approved biographical material of Writer (including without limitation the name "Cutty Ranks") in connection with the use, promotion and exploitation of Compositions hereunder.

       (d)    Writer warrants and represents that it has the right to grant to Publisher all of the rights set forth above with respect to the Compositions.

       (e)    Writer warrants and represents that any sale, assignment, transfer, or other grant of rights in or to Writer's Interest in the Compositions shall be subject to Publisher's rights hereunder and the terms and conditions hereof.

       (f)    (i)    Notwithstanding anything contained herein, during the sixty (60) day period following the date which is ten (10) years following the Effective Date or, if later, the date on which Writer's account hereunder fully recoups as shown by a statement rendered to Writer, Writer may notify Publisher of Writer's desire that administration rights in Writer's retained share of the copyright in the Compositions revert to Writer on a prospective basis. Such administration rights will automatically revert to Writer as of the end of the quarter-annual accounting period in which Writer's notice is received by Publisher ("Reversion Date") and Writer shall be entitled to collect one hundred percent (100%) of the so-called "writer's share" of income generated by the Compositions, and fifty percent (50%) of the "publisher's share" of such income. Publisher's copyright and administration rights (and all other rights hereunder) in and to Publisher's share of each Composition shall be unaffected by such reversion and Publisher

3

shall have the right to collect and retain for its own account fifty percent (50%) of the so-called "publisher's share" of income generated by the Compositions. Without limiting the foregoing, if as of the date which is ten (10) years following the date of the termination or expiration of the Term hereunder Writer's account hereunder is unrecouped (as shown by the last statement delivered to Writer) Writer shall have the option within six (6) months or the rendition of the next semi-annual statement to Writer, whichever is later, to repay to Publisher an amount representing one hundred and twenty-five percent (125%) of such unrecouped balance and, following the receipt in cleared funds of such repayment by Publisher, Writer's account shall be deemed recouped for the purposes of this subparagraph 1(f)(i).

(ii)    Publisher shall have the right, for twelve (12) months with respect to the United States and eighteen (18) months for the remainder of the Territory, following the commencement of Writer's co-administration rights with respect to the Compositions, as set forth above, to collect all income (excluding Writer's share of performance royalties) earned by the Compositions prior to the Reversion Date but not collected prior thereto ("Post Co-Administration Collection Period") and such income shall constitute gross income hereunder and shall be processed and paid pursuant to the terms of this Agreement. Any income originating from a quote issued by Publisher with respect to a Composition prior to the commencement of Writer's co-administration rights shall be deemed to have been earned prior to the Reversion Date. Notwithstanding the foregoing, following the Reversion Date, Publisher shall have no further obligation or right to collect and/or pay to Writer any monies attributable to the Compositions; provided, however, if, after the Reversion Date any third party debits Publisher's account for an overpayment of income in respect of the Compositions (and Publisher had theretofore accounted to Writer for such income), the amount of the debit, less Publisher's share of such income, shall be considered an overpayment to Writer and at Publisher's election, shall be promptly paid back to Publisher by Writer upon written demand or deducted from any payments due or thereafter becoming due to Writer.

2.    Intentionally Deleted

3.    Advances.

(a)    As an advance against any and all sums otherwise payable to Writer pursuant to this Agreement, Publisher shall pay to Writer the total aggregate sum of Seventy-Five Thousand Dollars ($75,000), such advance to be payable as follows: within fourteen (14) days following the later of: (w) the full execution of this Agreement (and completion of all Exhibits and Schedules), (x) fulfilment of Writer's obligations under subparagraph 2(b) of the separate administration agreement between the parties of today's date (the "Administration Agreement") (including without limitation acceptance by Jack Russell of the applicable letter of direction as set forth in Exhibit B of the Administration Agreement); and (y) Publisher's receipt of an invoice from Writer, and (z) Publisher's confirmation that neither Writer nor any third party on behalf of Writer has collected or been paid any mechanical royalties prior to the date hereof in respect of Writer's Interest in the Compositions set forth on Schedule "A".

(b)    Provided that Writer is not in material breach of any of Writer's obligations, warranties or representations hereunder, in the event that:

(i)    Writer's account hereunder fully recoups within twenty-four (24) months of the date hereof (as demonstrated by a statement rendered to Writer hereunder) (the "Recoupment Event"), Writer shall be entitled to request within thirty (30) days of the Recoupment Event the payment by Publisher of a further advance of fifty thousand dollars ($50,000), which advance shall be fully recoupable from royalties payable to Writer hereunder; and

(ii)    Following the date which is twenty-four (24) months of the date hereof Writer's account hereunder fully recoups within eighteen (18) months thereafter (i.e. within forty-two (42) months of the date hereof), including without limitation the recoupment of any additional advance paid under subparagraph 3(b)(i) (as demonstrated by a statement rendered to Writer hereunder) (the "Additional Recoupment Event"), Writer shall be entitled to request within thirty (30) days of the Additional Recoupment Event the payment by Publisher of a further advance of fifty thousand dollars ($50,000), which advance shall be fully recoupable from royalties payable to Writer hereunder.

(c)    Writer hereby irrevocably requests and authorizes Publisher to pay to Minter & Associates the sum of Five Thousand Dollars ($5,000) for legal services provided, such sum to be paid at the same time Writer is paid the "execution advance" under subparagraph 3(a) above and which sum shall be payable in addition to the "execution advance" payable to Writer hereunder and shall be fully recoupable form royalties payable to Writer hereunder. Publisher's compliance with this authorization will constitute an accommodation to Writer alone and nothing contained herein shall constitute Writer's attorney as a beneficiary of, or party to, this Agreement (or any other agreement between Publisher and Writer). All payments to Writer's attorney hereunder will constitute payment to Writer and Publisher will have no liability by reason of any erroneous payment it may make or failure to comply with this authorization.

(d)    The parties acknowledge and agree that all advance and recoupable sums hereunder shall, in addition to being fully recoupable form royalties payable to Writer hereunder, be fully cross-collateralized and recoupable from all royalties payable to Writer under the Administration Agreement.

4.    Royalties.

(a)    In consideration of the rights granted to Publisher herein, Publisher shall pay or credit the following royalties to Writer with respect to the exploitation of the Compositions (and Publisher shall recoup any advances and chargeable costs paid to or on behalf of Writer hereunder from such royalties):

(i)    Seventy-five percent (75%) of all Net Sums (as hereinafter defined) received by Publisher under any mechanical, transcription, print or other license (other than in respect of public performance rights, directly procured covers and synchronization rights) in respect of the Compositions, or from any other source (excluding performing rights organizations) in respect of the exploitation of the Compositions.

5

(ii)    Sixty-five percent (65%) of all Net Sums received by Publisher with respect to any Covers in respect of the Compositions. The term "Cover Recordings" means: (i) a recording of a Composition which does not feature Writer as a lead vocalist, featured musician or producer where Writer is credited as such but excluding the first exploited recording (i.e. mechanical reproduction) of such Composition; and/or (ii) recordings of Compositions which have arisen from Publisher and/or any of its sub-publishers directly and identifiably introducing Writer to any artist, group, producer, writer or composer to the extent of the Compositions co-written with any of the aforesaid at the writing session and/or relating to the project in each case the subject of the introduction; and/or (iii) recordings procured by Publisher or its affiliates (i.e. pitched and placed with an artist other than Writer).

(iii)    Sixty-five percent (65%) of all Net Sums received by Publisher with respect to any synchronization licenses in respect of the Compositions.

(iv)    Fifty percent (50%) of all Net Sums received by Publisher comprising the "publisher's share" of public performance income in respect of the Compositions reducing to twenty percent (20%) of any Net Sums comprising the "publisher's share" of public performance income in respect of public performance in respect of Cover Recordings.

(v)    Seventy percent (70%) of all Net Sums received by the Publisher and relating to the exploitation of Compositions hereunder not covered by subparagraph 4(a)(i) to (iv) above.

(vi)    As used in this paragraph 4, "Net Sums" shall mean all royalties actually received by Publisher in Switzerland or the United States (or which are credited against an advance previously paid to Publisher) which are directly and identifiably attributable to the exploitation of the Compositions, less all costs incurred in connection with the exploitation of the Compositions, including, without limitation, all costs of collection (pro-rated to the extent applicable in the event such collection costs do not solely pertain to the Compositions), copyright registration, the costs of printing, arranging, editing, exploiting and selling printed editions of the Compositions, any taxes required to be deducted, any collection or other society charges, and any sums paid or owed to third party subpublishers, licensing agents, arrangers, adaptors or translators of the Compositions. Publisher's overhead costs are excluded. Notwithstanding the foregoing, Publisher confirms that there will be no subpublishing deduction for territories where it is not represented by a local third party sub-publisher or administrator (currently Austria, Switzerland, Canada and the United States and in which territories royalties payable to Writer shall be calculated on an "at source" basis), and in any other territory where Publisher is represented by a third party subpublisher, administrator or collection agent then the maximum deductions made by such parties shall not exceed ten percent (10%) of the gross local income for mechanical income and twenty percent (20%) of the gross local income for all other exploitations (it being acknowledged that references to "gross local income" shall mean all sums actually collected by Publisher's sub-publishers and administrators less local society deductions and other customary bona fide and actual deductions).

(vii)    All payments to Writer hereunder shall be subject to the deduction or withholding of all taxes required to be deducted or withheld under the laws of any country or

territory and to the exchange control regulations of any country or territory from which the relevant monies are derived.

(b)    Publisher shall be under no obligation to pay any other sums whatsoever in connection with the Compositions, except as set forth in this Agreement, and no royalties shall be paid on any complimentary copies of the Compositions, copies of the Compositions sold but not paid for, copies of the Compositions sold and returned to Publisher or copies of the Compositions sold or given away as new issues or for advertising purposes.

(c)    In the event that Writer shall receive directly any sums that should have been paid to Publisher pursuant to the terms hereof, Writer shall hold such amounts in trust for the benefit of Publisher and shall remit to Publisher such amounts (together with all accompanying accounting statements) within ten (10) days after receipt thereof.

(d)    In no event shall Writer be entitled to share in any advance payments, guarantee payments or minimum royalty payments which Publisher may receive in connection with any subpublishing agreement, collection agreement, licensing agreement or other agreement with respect to the Compositions. Notwithstanding the foregoing, in the event that such advance, guarantee payment or minimum royalty payment is solely and expressly attributable to the Compositions hereunder, Publisher will credit Writer its pro rata share in accordance with subparagraph 4(a) above.

(e)    Publisher shall be entitled to collect all monies payable with respect to the Compositions including monies earned but not paid prior to the effective date hereof, which shall include all sums otherwise payable to Writer by Jack Russell Music Limited and subject at all times to the provisions of subparagraph 2(b) of the separate administration agreement between the parties of today's date.

(f)    Subject to subparagraph 4(e) above, If the Publisher or its agent or licensee does not receive in any part of the Territory fifty percent (50%) of the total public performing fees and one hundred (100%) of all other fees and royalties in connection with the use and/or exploitation of the Compositions in the Territory (excluding collection society and society commissions) for any reason other than Publisher's agreement with its sub-publishers/licensees or any act or omission by them, then the proportion of such fees and royalties (including without limitation advances payable hereunder) payable by the Publisher to Writer hereunder shall be correspondingly reduced, so that Publisher shall in any event receive and retain the same proportion of all fees and royalties which the Publisher would have received and retained pursuant to subparagraphs (a)(i) to (a)(v) of this paragraph 4 if Publisher had received fifty percent (50%) of the total public performing fees and one hundred percent (100%) of all other fees and royalties as aforesaid.

5.    Accounting.

(a)    Royalty statements hereunder will be rendered on a semi-annual basis, within ninety (90) days following December 31st and June 30th of each year. Writer shall be entitled to cause a certified public accountant or attorney who is not then currently engaged in an

outstanding audit of Publisher, to audit Publisher's books and records insofar as they relate to this Agreement upon reasonable notice to Publisher provided that such examination shall take place at Publisher's offices during normal business hours, not more than once in each calendar year during which Writer receives a statement and at Writer's sole cost and expense. All royalty statements rendered by Publisher to Writer shall be binding upon Writer and not subject to any objection by Writer for any reason unless specific objection, in writing, stating the basis thereof is given to Publisher within three (3) years from the date rendered. Suit shall be commenced on any challenged statement within three (3) years after the date a statement is rendered, after which suit shall be forever barred. Publisher's accounting and payment obligations hereunder may be undertaken and fulfilled by its affiliated entities (including without limitation Ultra International Music Publishing, LLC) subject to Publisher remaining primarily liable.

(b)    Neither Writer nor any Person acting on Writer's behalf shall have the right to commence any examination of Publisher's books and records unless and until such Person engaging in such examination has agreed in writing, that neither the Person engaging in such examination, nor any representatives thereof, shall at any time or in any manner either directly or indirectly, disclose or communicate to any Person, other than Writer or Writer's attorneys or accountants (and such recipients shall also have executed and delivered to Publisher similar agreements), any information acquired from Publisher's books and records during any such examination, or any information of any kind concerning any matters reflecting or relating to Publisher's business or the business of Publisher's affiliated companies obtained through such examination, without regard to whether any or all of such information would otherwise be deemed confidential material, except pursuant to legal process issued in connection with a court proceeding. Writer shall cause Publisher to receive one (1) copy of any audit report prepared as a result of any examination of Publisher's books and records promptly following Writer's receipt of same.

(c)    If Writer or any Person acting for or on behalf of Writer shall commence suit on any controversy or claim concerning royalty accountings rendered hereunder, said claims and the scope of the proceedings shall be limited to determination of the amount of the royalties due for the accounting period(s) concerned, and neither Writer nor any Person acting for or on behalf of Writer shall seek or be entitled to any equitable relief (other than an accounting) or any other relief except recovery of royalties found owing. The recovery of any such royalties shall be the sole remedy available to Writer by reason of any claim related to Publisher's royalty accountings or payments. Without limiting the generality of the foregoing, neither Writer nor any Person acting for or on behalf of Writer shall have any right to seek or obtain termination of this Agreement or of the Term hereof or any injunction against Publisher and/or any Person and/or any other equitable (other than an accounting) relief against Publisher and/or any Person or avoid the performance of Writer's obligations hereunder by reason of any claim relating to Publisher's royalty accountings or payments. The foregoing shall not apply if a court of competent jurisdiction shall find that Publisher has committed fraud with respect to its accountings

6.    Territory.    The "Territory" of this Agreement shall be the Universe.

7.    Legal Actions. Any legal action brought by Publisher against any alleged infringer of the Compositions shall be solely initiated and prosecuted by Publisher in consultation with Writer], and if there is any recovery made by Publisher as a result thereof, after deduction of the expense of litigation, including but not limited to reasonable attorneys' fees and court costs (pro-rated to the extent applicable in the event such fees and costs do not solely pertain to the Compositions), a sum equal to Writer's percentage of such net proceeds pursuant to subparagraph 4(a) above (according to income type) shall be paid or credited to Writer.

8.    Force Majeure.    If because of an act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government of governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; or other cause of a similar or different nature not within Publisher's control, Publisher is hampered in the exploitation or administration of musical compositions, then, without limiting Publisher's rights, Publisher shall have the option, by giving Writer notice, to suspend the then-current Contract Period and the Term for the duration of any such contingency plus such additional time as is necessary so that Publisher shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the Option Period provided that any such suspension as a result of a force majeure event shall not continue for longer than six (6) months in any event.

9.    Representations and Warranties; Indemnification.

Writer warrants and represents that:

(a)    The title, lyrics, music and other material comprising the Compositions are and shall be new, original and capable of copyright protection throughout the world, and neither the lyrics, music and titles of the Compositions shall infringe upon any statutory or common law rights of any Person, nor violate any statutory or common law;

(b)    Writer's Interest in the Compositions are and shall be Writer's sole and exclusive property subject only to the terms of this Agreement, free from any adverse claims or rights therein by any other Person whatsoever. There are no agreements of any kind in respect of the Compositions or any right, title or interest therein or the copyright thereof, the existence and terms of which have not been disclosed in writing to Publisher;

(c)    Writer has not heretofore, and shall not hereafter enter into any agreement or perform any act which diminishes, or is inconsistent with, the rights granted to Publisher pursuant to this Agreement; furthermore, Writer warrants that prior to the date hereof neither Writer nor any of Writer's affiliates or any third party publishers or administrators have licensed any of the Compositions nor received or claimed any royalties or fees due in respect of Writer's Interest in the Compositions;

(d)    Writer has and shall continue to have the full right, power and authority to enter into and fully perform this Agreement. Without limiting the foregoing, no consent of any Person is required, nor shall it be required, in order to effectuate the grant of rights made to

9

Publisher under this Agreement, as well as to Publisher's enjoyment of such rights and the proceeds thereof as contemplated hereunder;

      (e)    The information set forth in Schedule "A" with respect to the Compositions is accurate in all respects, it being acknowledged and agreed that this representation and warranty is of the essence of this Agreement;

      (f)    Writer shall execute any further documents which Publisher may deem necessary or desirable to effectuate the intent and substance of this Agreement. If Writer shall fail or refuse to execute and deliver any such further document(s) within ten (10) business days following the date that Publisher has made such documents available to Writer, Writer hereby appoints Publisher as Writer's true and limited lawful attorney-in-fact solely to execute such document(s) in Writer's name and on Writer's behalf. Such power of attorney is irrevocable and is coupled with an interest. On request Publisher shall supply Writer with a copy of any such documents.

      (g)    Writer shall pay all royalties and other payments which may become due to writers, artists, producers and any third party entitled to payment with respect to Writer's Interest in the Compositions. Publisher shall not be required to make any payments of any nature for, or in connection with, the exploitation of the Compositions except as specifically set forth herein.

      (h)    Writer hereby warrants and represents that it has not, and that no Person has, prior to the date hereof, sold, assigned, or otherwise transferred or alienated any right, title or interest in or to the Compositions (or any portion thereof).

      (i)    Writer warrants, represents and covenants that, promptly following Publisher's request for the same, it will furnish (A) copies of agreements relating to a particular Composition, together with any and all amendments, modifications or renewals to date of any such agreements, and (B) if Publisher deems it reasonably necessary to fulfill its obligations hereunder and/or exercise any of its rights hereunder, copies of all correspondence, files, original documents, royalty records and the like relating to the Compositions.

    10.    Indemnity.   Writer shall at all times defend, indemnify and hold harmless Publisher and its affiliates, officers, representatives, agents, licensees and distributors (collectively, the "Other Indemnitees") from and against any and all demands, claims, damages, liabilities, losses, costs and expenses, including legal expenses and reasonable outside counsel fees, arising out of any alleged breach or breach by Writer of any warranty, representation or agreement made herein, or pertaining to any act, error or omission allegedly committed or committed by Writer or any Person allegedly acting on Writer's behalf or under Writer's direction or control. Writer will reimburse Publisher and the Other Indemnitees, on demand, for any payment made at any time after the date hereof in respect of any liability or claim for which Publisher or the Other Indemnitees are entitled to be indemnified provided that the claim concerned has been settled with Writer's prior approval (not to be unreasonably withheld or delayed) or has resulted in an adverse judgment against Publisher and/or the Other Indemnitees by a court of competent jurisdiction. If any claim involving such subject matter has not been

10

resolved, or has been resolved by a judgment or other disposition, which is not adverse to Publisher or the Other Indemnitees, Owner shall reimburse Publisher for fifty percent (50%) of the expenses actually incurred by Publisher and the Other Indemnitees in connection with that claim. Pending the determination of any claim involving any such alleged breach or failure, Publisher may withhold sums due to Writer in an amount reasonably related to such claim, and, pending the determination of the applicable claim(s), Publisher may also elect to suspend the operation of the Term. If no litigation on the claim concerned has been commenced within one (1) year after Publisher is first notified of said claim, Publisher will release any such monies then being held by Publisher by reason of that claim, upon Writer's request, unless Publisher anticipates on reasonable grounds that such litigation may be commenced, or unless active settlement negotiations are in process. Any release by Publisher of monies withheld hereunder shall be without prejudice to Publisher's rights to withhold monies in the future with respect to that claim or any other, if Publisher deems such action to be reasonably necessary. If Writer does not consent to a settlement proposed by Publisher for an amount exceeding ten thousand dollars ($10,000), Writer will nevertheless be required to reimburse Publisher for the full amount paid unless Writer makes bonding arrangements, satisfactory to Publisher in its sole discretion, to assure Publisher of reimbursement for all damages, liabilities, costs and expenses (including reasonable legal expenses and reasonable outside counsel fees) which Publisher may incur as a result of that claim. Writer may participate in the defense of any such claim through counsel of Writer selection at Writer's own expense (and Publisher shall notify Writer of any such claim), but Publisher will have the right at any time, in its sole discretion, to retain or resume control of the conduct of the defense. Notwithstanding anything to the contrary contained in this Agreement, Writer irrevocably consents to the jurisdiction of any Court or other forum in which a claim is asserted against Publisher or the Other Indemnitees which arises out of or relates to any alleged breach or breach by Writer of any warranty, representation or agreement made herein, or any other act, error or omission allegedly committed or omitted by Writer or any person or entity allegedly acting on Writer's behalf or under Writer's direction or control.

11.    Entire Agreement/Choice of Law/Assignment.    This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. No modification of this Agreement or any provision hereof shall be binding unless in writing signed by the parties sought to be charged. This Agreement shall be construed under the internal laws of the State of New York applicable to contracts to be performed wholly therein. The New York courts (state and federal), only, shall have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in New York County, and not elsewhere. Notwithstanding the foregoing, Publisher reserves the right to pursue a claim and/or initiate proceedings against the Writer hereunder in jurisdictions other than the New York Courts. If any part of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, it shall not affect the validity of the balance of this Agreement. Publisher may, in its sole discretion assign this Agreement or any part hereof to any (i) any parent, subsidiary, division, sister corporation, joint venture partner or affiliate thereof or other affiliate of Publisher; (ii) a person acquiring all or substantially all of the publishing-related assets of Publisher; or (iii) an entity merged or consolidated with Publisher and such rights may be assigned by any assignee. Writer may not assign this contract or any part hereof without the prior written consent of Publisher.

11

12.   Notices.   Any notice, accounting or payment which either party hereto is required or desires to give to the other party shall be addressed to the respective addresses first written above or to such other address as either party shall designate in writing to the other party from time to time.   All notices, except for accounting statements furnished by Publisher hereunder, shall be sent by certified or registered mail, return receipt requested, and the day of mailing of any such notice shall be deemed the date of the giving thereof.  All notices sent to Publisher shall be addressed to the General Counsel. [A copy of all notices to Writer shall be sent to Minter & Associates LLC., 5398 East Mountain Street, Stone Mountain, Georgia 30083 provided that any failure by Publisher to deliver any such courtesy notice shall not be deemed a breach of this Agreement].

13.   Legal Counsel/Binding Agreement. Writer   warrants,   represents   and acknowledges that he has read this agreement, understands it and enters into it intending to be bound hereby, that he has had the opportunity to consult with independent counsel of his choice experienced in entertainment matters in connection with this agreement, and that any failure to do so is knowing and willful; and that this Agreement is the product of an informed negotiation, and as such, it will not be construed against either party as the drafter

14.   Approvals. In the event that Publisher shall require Writer's agreement approval or consent to any action matter or thing hereunder Publisher shall be entitled to serve written notice on Writer (which such notice may be served by email to Writer to jamcutty@gmail.com or such other email address as Writer shall notify Publisher in writing) setting out the action matter or thing in respect of which such agreement approval or consent is required and in the event that Writer shall not within five (5) business days (reducing to three (3) business days for synchronization approvals) after service of such notice have served on Publisher a notice (and email shall constitute sufficient notice) refusing such agreement approval or consent and giving Writer's reasons for such refusal the same shall be deemed to have been given without further formality as if it had been given in writing. Writer shall not unreasonably withhold consent hereunder in relation to any matter requiring Writer's consent or approval (and as a condition to giving any consent or approval, to require improvements to this Agreement, financial or otherwise, shall be deemed unreasonable). Publisher's inadvertent failure to obtain Writer's approval or consent or to consult with Writer in respect of any matter requiring Writer's approval, consent or consultation shall not be deemed a breach of this Agreement. In addition, any approval or consent provided by or consultation with Writer's Manager or representative shall be deemed as if Writer shall have personally been consulted in person or provided such approval or consent (as applicable).

15.   Cure/Remedies.

(a)   Publisher shall not be deemed in breach of any of its obligations hereunder unless Writer shall have given Publisher specific written notice of the nature of such alleged breach and Publisher shall fail to cure such breach, if any, within thirty (30) days after receipt of such notice. It is further agreed that Writer's rights and remedies in the event of a breach or alleged breach by Publisher of this Agreement shall be limited to Writer's rights, if any, to recover damages in an action at law, and in no event shall Writer be entitled by reason of any such breach or alleged breach to terminate this Agreement or to enjoin or restrain the exploitation by Publisher of the

12

Compositions or the exercise of any rights granted hereunder. The limitation of remedy set forth in the immediately preceding sentence shall not apply in the event a court of competent jurisdiction finds that Publisher as committed fraud with respect to its accountings hereunder.

(b)      Writer expressly agrees that the Compositions are of a special unique character and that in the event of a breach by Writer of any term, condition or covenant herein, Publisher shall be entitled to apply for injunctive relief (including, but not limited to, preliminary and/or temporary injunctive relief or restraints against Writer) in addition to any other remedies available to it. Writer shall have the right to contest the facts of any such action or petition.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

Ultra Music Publishing Europe AG ("Publisher")

By: _____

By: _____
Philip Thomas p/k/a "Cutty Ranks", both individually and on behalf of my publishing designee (BMI) ("Writer")

Performing Rights Association Affiliation: BMI
CAE/IPI #:

13

Schedule "A":

INTRODUCCION B - EL COSITA MIX

Rodney Sebastian Clark Donalds     75%
Philip Thomas                      25%

LA CRIPTA REMIXES CUTTY RANKS Y EL CHOMBO

Rodney Sebastian Clark Donalds     75%
Philip Thomas                      25%

NEW VERSION 2018 DAME TU COSITA

Rodney Sebastian Clark Donalds     87.5%
Philip Thomas                      12.5%

COMPLETION IN FULL BY WRITER IS A CONDITION PRECEDENT TO PUBLISHER'S
OBLIGATIONS UNDER THIS AGREEMENT

14

Exhibit "A" to that certain agreement dated as of July 18th, 2018 by and between Philip Thomas both individually and on behalf of his publishing designee (BMI) -with- Ultra Music Publishing Europe AG (hereinafter referred to as "Publisher").

TRANSFER OF COPYRIGHT

Philip Thomas
5 Wickham Drive, Kingston 8, St. Andrew,
Jamaica, West Indies

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Assignor"), individually and on behalf of his publishing designee, heirs, executors, successors and assigns, and with effect from January 1st 2019, hereby irrevocably sells, transfers and assigns to Ultra Music Publishing, Europe AG an undivided fifty (50%) of all of Assignor's right, title and interest in and to (i) all of the musical compositions, or portions thereof, listed on Schedule "A" attached hereto and made a part hereof (hereinafter, the "Compositions"), including, without limitation, the worldwide copyrights (including any renewal or extension of copyrights) therein and thereto; ((ii) any and all licenses, sublicensing agreements, administration agreements, participation agreements, licensing agreements, co-ownership agreements, collection agreements, public performance society agreements, and all other contracts and agreements relating to the Compositions and/or any use or exploitation thereof, and any and all rights and benefits thereunder; and (iv) any and all other rights to and interests in or relating to the Compositions, including, but not limited to, the right to receive income in respect of the Compositions; and (v) an undivided one hundred percent (100%) of the worldwide rights of administration, promotion and collection, including but not limited to the musical compositions listed below:

| Title | Writer(s) | Total |
|-------|-----------|-------|
| See Schedule A | | |

Dated as of: July 18th, 2018

By: _____
Philip Thomas, both individually
and on behalf of my publishing designee (BMI) ("Writer")

15

# EXHIBIT "B"

ADMINISTRATION AGREEMENT (the "Agreement"), made as of this 18th day of July, 2018 by and between Philip Thomas p/k/a "Cutty Ranks" and his affiliated publishing designee (BMI), having an address at 5 Wickham Drive, Kingston 8, St. Andrew, Jamaica, West Indies (hereinafter individually and collectively, jointly and severally, "Owner") and Ultra Music Publishing Europe AG, having an address at C/o Sony Music Entertainment, Letzigraben 89 CH – 8003, Zurich, Switzerland (hereinafter referred to as "Administrator").

WHEREAS, Owner owns and/or controls the copyrights and all other rights in certain musical compositions as more particularly set forth herein; and

WHEREAS, Administrator is engaged in the business of music publishing or is in a position to arrange for music publishing in the Territory, as defined below.

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties hereinafter made by the parties hereto, Owner and Administrator hereby agree as follows:

1.    Grant of Rights.

(a)    Subject to paragraph 2(a) below Owner hereby licenses, grants and assigns exclusively to Administrator for the territory of the Universe (the "Territory") and for the duration of the Term (as described in paragraph 6 below): (i) with effect from January 1st 2019 (the "Effective Date"), all rights, including but not limited to those rights specified in sub-paragraphs (i) through (ix) of this paragraph 1(a), in and to each and every musical composition which is initially composed, owned or controlled (in whole or in part) after the Effective Date and during the Term of this Agreement, in whole or in part, directly or indirectly, by Owner or any affiliated entity; and (ii) with effect from January 1st 2021 each and every musical composition which is as of the Effective Date composed, owned or controlled (in whole or in part) in whole or in part, directly or indirectly, by Owner or any affiliated entity, including without limitation those musical compositions as set forth on Schedule "A", attached hereto and made a part hereof, including but not limited to the titles, lyrics and music thereof. Owner hereby represents and warrants that all of the information contained in Schedule A is complete and accurate. Such musical compositions referenced in this paragraph 1(a) are hereinafter referred to in the aggregate as the "Administered Compositions" and each individually as an "Administered Composition". The rights granted exclusively to Administrator under this Agreement in connection with the foregoing Administered Compositions include but are not limited to:

(i)    The exclusive right, to perform and license others to perform the Administered Compositions publicly or privately, for profit or otherwise, by means of public or private performance, radio broadcast, television, or by any other means or media, whether now known or hereafter devised, and to collect all royalties and fees payable by reason thereof;

(ii)    The exclusive right to make or cause to be made, and to license others to make, phonograph records, master recordings, transcriptions, soundtracks, pressings and any other mechanical, electrical, digital or other reproductions of the Administered Compositions, in whole or in part (including the right, subject to Owner's prior written approval, to grant licenses to third parties authorizing so-called "sampling" and/or interpolation of the Administered Compositions), and to use, manufacture, advertise, market, license, sell, or otherwise exploit such

1

reproductions for any and all purposes, including, without limitation, private and public performances, radio broadcast, television, motion pictures, phonograph records, exploitations via the Internet, wireless networks and any and all other means and devices whether now known of hereafter devised, and to collect all royalties and fees payable by reason of sales or revenue generated from each such reproduction in the Territory. Without limiting the foregoing, Administrator shall be entitled to grant reduced rate mechanical licenses to record companies in accordance with so-called "Controlled Compositions" clauses;

(iii)    The exclusive right to grant worldwide licenses for the recording and, in reasonable consultation with Owner (other than with respect to any blanket licensing arrangement Administrator or its licensees may enter into involving a majority of the musical compositions controlled by Administrator), the synchronization of the Administered Compositions, for any and all purposes, in any and all audiovisual works and devices, including, without limitation, television programs, motion pictures, films, videos and commercials and any and all other means and devices, whether now known or hereafter devised, and to collect all royalties and fees payable by reason thereof. The previous sentence notwithstanding, Owner shall have the right to approve any potential uses in paid political or religious advertisements, advertisements promoting tobacco, firearm or ammunition products or personal hygiene products; "X" or "NC-17" rated films. Administrator will not grant a first mechanical licence in relation to an Administered Composition (recorded or to be recorded by an artist other than Cutty Ranks where Owner shall have notified Administrator in writing (a) that Owner wishes Administrator to withhold the grant of such licence in respect of a particular Administered Composition and (b) the Relevant Release Information in respect of which such withholding of grant of licence is intended to apply. "Relevant Release Information" means the name of the recording artist who has recorded such Administered Composition, the name of the record company which is intending to release such recording and the date of such intended release, provided further that such restriction shall only apply to physical releases and not to digital releases.

(iv)    The exclusive right to print, publish, sell and multiply, and to authorize others to print, publish, sell and multiply, copies of the Administered Compositions in all forms, including, without limitation, sheet music, orchestrations, arrangements and other editions of the Administered Compositions, separately or together with other musical compositions, including, without limitation, in song folios, compilations, song books, mixed folios, personality folios and lyric magazines, with or without music, and to collect all royalties and fees payable by reason thereof;

(v)    The exclusive right to make or authorize others to make any arrangement, adaptation, translation, dramatization or transposition of any of the Administered Compositions or of the titles, lyrics, or music thereof, in whole or in part, and in connection with any other musical, literary or dramatic material, and to prepare or authorize derivative works based on the Administered Compositions, and to collect all royalties and fees payable by reason thereof. Notwithstanding the foregoing, Administrator will not make or authorize any material changes to any Administered Composition without Owner's prior written approval (excluding faithful translations and the authorization of remixed versions of Administered Compositions which do not alter the fundamental character of the applicable Composition);

(vi)    The exclusive right to secure copyright registration and protection of the Administered Compositions in the Territory in Owner's name, including any and all renewals

2

and extensions of such copyright;

(vii)    The exclusive right to sublicense any or all of the rights granted herein to any person, firm, entity or corporation;

(viii)    The exclusive right to collect all monies derived from the exploitation of the Administered Compositions in the Territory during the Term and Collection Period (as those terms are hereinafter defined) and including without limitation all monies previously earned prior to the date hereof in connection with the Administered Compositions to the extent uncollected, including both the so-called publisher's share and the writer's share of such monies (excluding only the writer's share of public performance income which may be paid directly to the writers of the Administered Compositions); and

(ix)    All other rights of exploitation, administration, promotion and collection in and to the Administered Compositions and each of them.

(b)    Owner warrants and represents that it has the right to grant to Administrator all of the rights set forth above with respect to the Administered Compositions.

(c)    Owner warrants that any sale, assignment, transfer, or other grant of rights in or to Owner's interests in any of the Administered Compositions shall be subject to Administrator's rights hereunder and the terms and conditions hereof.

(d)    In the event that Administrator shall require Owner's agreement approval or consent to any action matter or thing hereunder Administrator shall be entitled to serve written notice on Owner (which such notice may be served by email to Owner to jamcuttyranks@gmail.com and to kamlaw@aol.com or such other email address as Owner shall notify Administrator in writing) setting out the action matter or thing in respect of which such agreement approval or consent is required and in the event that Owner shall not within five (5) business days (reducing to three (23) business days for synchronization approvals) after service of such notice have served on Administrator a notice (and email shall constitute sufficient notice) refusing such agreement approval or consent and giving Owner's reasons for such refusal the same shall be deemed to have been given without further formality as if it had been given in writing. Owner shall not unreasonably withhold consent hereunder in relation to any matter requiring Owner's consent or approval (and as a condition to giving any consent or approval, to require improvements to this Agreement, financial or otherwise, shall be deemed unreasonable). An inadvertent and non- repetitive failure by Administrator to obtain Owner's consent in respect of any matter requiring Owner's approval shall not be deemed a breach of this Agreement.

2    Jack Russell Agreement/Co-Publishing Agreement.

(a)    Reference is hereby made to the co-publishing and administration agreement between Owner and Administrator of today's date relating to the musical works "Introduccion B – El Cosita Mix", "La Cripta Remixes Cutty Ranks Y El Chombo" and "Dame Tu Cosita (New Version 2018)" and all version thereof ("Co-Publishing Agreement"). Notwithstanding anything contained to the contrary herein, Compositions under the Co-Publishing Agreement shall be subject

3

to and governed by the terms of the Co-Publishing Agreement. For the avoidance of doubt all royalties payable hereunder shall be fully cross-collateralized with and be applied towards recoupment of all advances and recoupable sums under the Co-Publishing Agreement. Further, it is agreed that should Administrator procure a synchronization and/or a recording by a third party artist (i.e. a cover recording) of any Administered Composition hereunder such Administered Composition, for which Administrator has procured a synchronization and/or a recording by a third party artist as aforesaid, shall be deemed a Composition under the Co-Publishing Agreement and subject to the terms of the Co-Publishing Agreement in very respect.

(b)    Owner is party to an administration agreement with Jack Russell Music Limited ("JR") dated 1ˢᵗ January 2010 (the "Jack Russell Agreement"). Owner warrants and represents that Owner shall terminate the Administration Period of the Jack Russell Agreement with effect from 31ˢᵗ December 2018. In addition, and as a condition of Administrator's obligations under this Agreement and the Co-Publishing Agreement, Owner shall irrevocably direct and authorize JR to account and pay (and JR agrees to account direct to) to Administrator all sums payable to Owner under the Jack Russell Agreement in accordance with the letter of direction set forth at Exhibit "B" hereto. Such sums shall be treated as gross income receivable under this Agreement save with respect to any sums received in relation to Compositions under the Co-Publishing Agreement which shall be treated as gross income received under the Co-Publishing Agreement. In the event that JR fails to account to Administrator then Owner shall immediately account and pay to Administrator all sums paid to Owner or any third party on Owner's behalf under the Jack Russell Agreement and Administrator reserves the right to deduct any such sums owing from any sums payable to Owner hereunder and/or under the Co-Publishing Agreement. Owner shall not agree to any modification or amendment to the Jack Russell Agreement.

3.    Royalties.

(a)    In consideration of the rights granted to Administrator herein, Administrator shall pay or credit the following royalties to Owner with respect to the exploitation of the Administered Compositions (and Administrator shall recoup any chargeable costs paid to or on behalf of Owner hereunder from such royalties):

(i)    Eighty-five percent (85%) (reducing to seventy-five percent (75%) with respect to any to any covers procured by Administrator's efforts (i.e., recordings of the Administered Compositions other than by Cutty Ranks) of all Net Sums (as hereinafter defined) received by Administrator under any mechanical, transcription, print or other license (other than in respect of public performance rights and synchronization rights as detailed below) in respect of the Administered Compositions in respect of the exploitation of the Administered Compositions.

(ii)    Seventy-five percent (75%) of all Net Sums received by Administrator with respect to any synchronization licenses in respect of the Administered Compositions.

(iii)    Seventy percent (70%) of all Net Sums received by Administrator comprising the "publisher's share" of public performance royalties in respect of the Administered Compositions.

4

(iv)    As used in this paragraph 3, "Net Sums" shall mean all monies actually received by Administrator in Switzerland or the United States which are directly and identifiably attributable to the exploitation of the Administered Compositions, less all actual, unaffiliated third party costs incurred in connection with the exploitation of the Administered Compositions, including, without limitation, all third party, out-of-pocket and verifiable costs of collection, copyright registration, the costs of printing, arranging, editing, exploiting and selling printed editions of the Administered Compositions, any taxes required to be deducted, any collection or other society charges, and any sums paid or owed to third party sub-publishers in any particular territory, or to licensing agents, arrangers, adaptors or translators of the Administered Compositions. Notwithstanding the foregoing, Administrator confirms that there will be no subpublishing deduction for territories where it is not represented by a local third party sub-publisher or administrator (currently Austria, Switzerland, Canada and the United States and in which territories royalties payable to Owner shall be calculated on an "at source" basis), and in any other territory where Administrator is represented by a third party sub-publisher, administrator or collection agent then the maximum deductions made by such parties shall not exceed ten percent (10%) of the gross local income for mechanical income and twenty percent (20)% of the gross local income for all other exploitations (it being acknowledged that references to "gross local income" shall mean all sums actually collected by Administrator's sub-publishers and administrators less local society deductions and other customary bona fide and actual deductions).

(v)    All payments to Owner hereunder shall be subject to the deduction or withholding of all taxes required to be deducted or withheld under the laws of any country or territory and to the exchange control regulations of any country or territory from which the relevant monies are derived.

(b)    Administrator shall be under no obligation to pay any other sums whatsoever in connection with the Administered Compositions, except as set forth in this Agreement, and no royalties shall be paid on any complimentary copies of the Administered Compositions, copies of the Administered Compositions sold but not paid for, copies of the Administered Compositions sold and returned to Administrator or copies of the Administered Compositions sold or given away as new issues or for advertising purposes.

(c)    In the event that Owner shall receive directly any sums that should have been paid to Administrator pursuant to the terms hereof, Owner shall hold such amounts in trust for the benefit of Administrator and shall remit to Administrator such amounts (together with all accompanying accounting statements) within ten (10) business days after receipt thereof.

(d)    In no event shall Owner be entitled to share in any advance payments, guarantee payments or minimum royalty payments which Administrator may receive in connection with any subpublishing agreement, collection agreement, licensing agreement or other agreement with respect to the Administered Compositions, unless such payments are made solely with respect to the Administered Compositions.

(e)    If the Administrator or its agent or licensee does not receive in any part of the Territory fifty percent (50%) of the total public performing fees and one hundred (100%) of all other fees and royalties in connection with the use and/or exploitation of the Administered Compositions in the Territory (excluding collection society and society commissions) for any reason other than

5

Administrator's agreement with its sub-publishers/licensees or any act or omission by them, then the proportion of such fees and royalties (including without limitation advances payable hereunder) payable by the Administrator to Owner hereunder shall be correspondingly reduced, so that Administrator shall in any event receive and retain the same proportion of all fees and royalties which the Administrator would have received and retained pursuant to subparagraphs (a)(i) to (a)(iii) of this paragraph 3 if Administrator had received fifty percent (50%) of the total public performing fees and one hundred percent (100%) of all other fees and royalties as aforesaid.

4.      Societies.  The grant of performing rights with respect to the Administered Compositions is expressly made subject to the rights of and the agreements between Owner and the performing rights society with which Owner is affiliated. Whichever performing rights society of Administrator is affiliated with Owner's performing rights society in the Territory shall collect all public performance fees and royalties earned in the Territory with respect to the Administered Compositions and shall pay the total publisher's share of royalties (i.e. the Owner's portion of the original publisher's share and the sub-publisher's share combined) directly to Administrator, for division as hereinabove provided.

5.      Accounting/Audit.

(a)      Royalty statements hereunder will be rendered on a semi-annual basis, within ninety (90) days following December 31st and June 30th of each year. Owner shall be entitled to cause a Certified Public Accountant who is not then currently engaged in an outstanding audit of Administrator, to audit Administrator's books and records insofar as they relate to this Agreement upon reasonable notice to Administrator, provided that such examination shall take place at Administrator's offices in New York City during normal business hours not more than once in each calendar year during which Owner receives a statement and at Owner's sole cost and expense. All royalty statements rendered by Administrator to Owner shall be binding upon Owner and not subject to any objection by Owner for any reason unless specific objection, in writing, stating the basis thereof is given to Administrator within three (3) years from the date rendered. Administrator's accounting and payment obligations hereunder may be undertaken and fulfilled by its affiliated entities (including without limitation Ultra International Music Publishing, LLC).

(b)      Neither Owner nor any person or entity acting on Owner's behalf shall have the right to commence any examination of Administrator's books and records unless and until the person or entity engaging in such examination has agreed in writing, that neither the individual nor the firm engaging in such examination, nor any representatives thereof, shall at any time or in any manner either directly or indirectly, disclose or communicate to any person, firm or accountants other than Owner or Owner's attorneys or accountants (and such recipients shall also have executed and delivered to Administrator similar agreements) any information acquired from Administrator's books and records during any such examination, or any information of any kind concerning any matters reflecting or relating to Administrator's business or the business of Administrator's affiliated companies obtained through such examination, without regard to whether any or all of such information would otherwise be deemed confidential material, except pursuant to legal process issued in connection with a court proceeding. Owner shall cause Administrator to receive one (1) copy of any audit report prepared as a result of any examination of Administrator's books and records promptly following Owner's receipt of same.

(c)        If Owner or any person or entity acting for or on behalf of Owner shall commence suit on any controversy or claim concerning royalty accountings rendered hereunder, said claims and the scope of the proceedings shall be limited to determination of the amount of the royalties due for the accounting period(s) concerned, and neither Owner nor any person or entity acting for or on behalf of Owner shall seek or be entitled to any equitable relief (other than an accounting) or any other relief except recovery of royalties found owing. The recovery of any such royalties shall be the sole remedy available to Owner by reason of any claim related to Administrator's royalty accountings or payments. Without limiting the generality of the foregoing, neither Owner nor any person or entity acting for or on behalf of Owner shall have any right to seek or obtain termination of this Agreement or of the Exploitation Period hereof or any injunction against Administrator and/or any third party and/or any other equitable (other than an accounting) relief against Administrator and/or any third party or avoid the performance of Owner's obligations hereunder by reason of any claim relating to Administrator's royalty accountings or payments.

6.        Exploitation Period. The Term of this Agreement shall commence as of the Effective Date and shall continue for a period of three (3) years. Notwithstanding the foregoing, if Owner's account hereunder and under the Co-Publishing Agreement shall not be in a recouped position as of the date on which the Term shall otherwise expire, then the Exploitation Period shall automatically be extended for an additional two (2) years or, if earlier, the date that a statement rendered to Owner evidences full recoupment of Owner's account (both hereunder and under the Co-Publishing Agreement). Notwithstanding the foregoing, following the date which is three (3) years from the Effective Date Owner shall have the right to pay Administrator one hundred fifteen (115%) percent of the Owner's unrecouped balance (both hereunder and under the Co-Publishing Agreement) following which the Term shall be deemed to have ended. Notwithstanding the foregoing, Administrator shall have an exclusive collection period of twelve (12) months following the expiration of the Term Period in all other countries of the Territory to collect sums earned during the Term in the Territory from the Administered Compositions (the "Collection Period"), subject to Administrator's accounting obligations with respect to such collected amounts.

7.        Enforcement. Owner hereby grants irrevocably to Administrator for the duration of the Term, during which Administrator's rights shall continue in force hereunder, the right to enforce and protect all rights in and to the Administered Compositions and the copyrights thereof in the Territory and in the sole judgment of Administrator to join Owner and such others as Administrator may deem advisable as parties plaintiff or defendant in any suits or proceedings, in the name of Owner and such others as Administrator may deem advisable, and to proceed with the same in the same manner and to the same extent as Owner or any other party or parties in interest might or could do had this authority not been given. Any recovery obtained by settlement, judgment or otherwise by Administrator shall be divided between Administrator and Owner (after the costs and expenses, including reasonable legal fees, shall have been paid out of such recovery) in accordance with the income splits set forth above in 3(a), according to income type.

8.        Name and Likeness. Owner hereby grants to Administrator the right to use the name, approved likeness and approved biographical material of the Owner and writers of the Administered Compositions hereunder in connection with the use, promotion and exploitation of Administered Compositions hereunder.

7

9.    Representations and Warranties. Owner hereby warrants and represents that:

(a)    The title, lyrics, music and other material comprising the Administered Compositions are new, original and capable of copyright protection throughout the world, and neither the lyrics, music and titles of the Administered Compositions shall infringe upon any statutory or common law rights of any third parties, nor violate any statutory or common law;

(b)    The Administered Compositions are and shall be Owner's sole and exclusive property, free from any adverse claims or rights therein by any other person, firm, corporation or association whatsoever. There are no agreements of any kind in respect of the Administered Compositions or any right, title or interest therein or the copyright thereof, the existence and terms of which have not been disclosed in writing to Administrator;

(c)    Owner has not heretofore, and shall not hereafter enter into any agreement or perform any act which diminishes, or is inconsistent with, the rights granted to Administrator pursuant to this Agreement; furthermore, Owner warrants that prior to the date hereof neither Owner nor any of Owner's affiliates or any third party publishers or administrators have received or claimed any royalties or fees due in respect of Owner's share of the Administered Compositions;

(d)    Any sale, assignment, transfer, mortgage or licensing or other grant of rights in or to Owner's interests in any of the Administered Compositions shall be subject to Administrator's rights hereunder and the terms and conditions hereof.

(e)    Owner has and shall continue to have the full right, power and authority to enter into and fully perform this Agreement. Without limiting the foregoing, the consent of no third party is required, nor shall it be required, in order to effectuate the grant of rights made to Administrator under this Agreement, as well as to Administrator's enjoyment of such rights and the proceeds thereof as contemplated hereunder;

(f)    Owner's interest in each of the Administered Compositions is as set forth in Schedule "A" hereto, and shall not subsequently be changed or altered by Owner in any manner that reduces the rights of or royalties to be paid to Administrator or any co-writer of any of the Compositions. The information set forth in Schedule "A" to this Agreement is accurate in all respects, it being acknowledged and agreed that such warranty is of the essence to this Agreement;

(g)    Owner shall execute any further document(s) which Administrator may deem necessary or desirable to effectuate the intent and substance of this Agreement. If Owner shall fail or refuse to execute and deliver any such further document(s) promptly following Administrator's request therefore, Owner hereby appoints Administrator as Owner's true and lawful attorney-in-fact to execute such document(s) in Owner's name and on Owner's behalf. Such power of attorney is irrevocable and is coupled with an interest. Without limiting the foregoing, Owner shall execute and deliver to Administrator, simultaneously with Owner's execution and delivery to Administrator of this Agreement, six (6) copies of the form of Notice of Assignment of Administration Rights which is attached hereto as Exhibit "A", and made a part hereof;

(h)    Owner shall account to and pay all royalties and other payments which may become due to writers, co-publishers, artists, producers and any third party entitled to payment with

8

respect to Owner's interest in the Administered Compositions. Administrator shall not be required to make any payments of any nature for, or in connection with, the exploitation of the Administered Compositions except as specifically set forth herein; and

(i)     Subject to the terms and conditions hereof, Owner hereby warrants and represents that Owner has not, and that no third party has, prior to the date hereof, sold, assigned, or otherwise transferred or alienated any right, title or interest in or to any portion(s) of the Administered Compositions as set forth in Schedule A and that all right, title and interest (including the worldwide copyright and the right to renew the same) in and to each Administered Composition and as reflected on Schedule "A" annexed hereto, is and shall be owned and controlled solely by Owner, subject to all of the terms hereof.

(j)     Owner further warrants and represents that Owner's share of all right, title and interest in the entire copyright in the Administered Compositions as set forth on Schedule "A" vests absolutely in Owner throughout the world for the full period of copyright.

11.     Indemnification.   Owner shall at all times defend, indemnify and hold harmless Administrator and its affiliates, officers, representatives, agents, licensees and distributors (collectively, the "Other Indemnitees") from and against any and all demands, claims, damages, liabilities, losses, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any alleged breach or breach by Owner of any warranty, representation or agreement made herein, or pertaining to any act, error or omission allegedly committed or committed by Owner or any person or entity allegedly acting on Owner's behalf or under Owner's direction or control. Owner will reimburse Administrator and the Other Indemnitees, on demand, for any payment made at any time after the date hereof in respect of any liability or claim for which Administrator or the Other Indemnitees are entitled to be indemnified provided that the claim concerned has been settled with Owner's prior approval (not to be unreasonably withheld or delayed) or has resulted in an adverse judgment against Administrator and/or the Other Indemnitees by a court of competent jurisdiction. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition, which is not adverse to Administrator or the Other Indemnitees, Owner shall reimburse Administrator for fifty percent (50%) of the expenses actually incurred by Administrator and the Other Indemnitees in connection with that claim. Pending the determination of any claim involving any such alleged breach or failure, Administrator may withhold sums due to Owner in an amount reasonably related to such claim, and, pending the determination of the applicable claim(s), Administrator may also elect to suspend (with written notice to Owner) the operation of the Term hereunder. If no litigation on the claim concerned has been commenced within one (1) year after Administrator is first notified of said claim, Administrator will release any such monies then being held by Administrator by reason of that claim, upon Owner's request, unless Administrator anticipates on reasonable grounds that such litigation may be commenced, or unless active settlement negotiations are in process. Any release by Administrator of monies withheld hereunder shall be without prejudice to Administrator's rights to withhold monies in the future with respect to that claim or any other, if Administrator deems such action to be reasonably necessary. If Administrator pays more than ten thousand dollars ($10,000) in settlement of any claim not reduced to judgment, Owner will not be obligated to reimburse Administrator for the excess unless Owner has consented to the settlement in writing, except as provided for in the next sentence. If Owner does not consent to a settlement proposed by Administrator for an amount exceeding ten thousand dollars ($10,000), Owner will nevertheless be required to reimburse Administrator for the full amount paid

9

unless Owner makes bonding arrangements, satisfactory to Administrator in its sole discretion, to assure Administrator of reimbursement for all damages, liabilities, costs and expenses (including reasonable legal expenses and reasonable outside counsel fees) which Administrator may incur as a result of that claim. Owner may participate in the defense of any such claim through counsel of Owner selection at Owner's own expense (and Administrator shall notify Owner of any such claim), but Administrator will have the right at any time, in its sole discretion, to retain or resume control of the conduct of the defense. Notwithstanding anything to the contrary contained in this Agreement, Owner irrevocably consents to the jurisdiction of any Court or other forum in which a claim is asserted against Administrator or the Other Indemnitees which arises out of or relates to any alleged breach or breach by Owner of any warranty, representation or agreement made herein, or any other act, error or omission allegedly committed or omitted by Owner or any person or entity allegedly acting on Owner's behalf or under Owner's direction or control.

12.    Integration. This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. No modification of this Agreement or any provision hereof shall be binding unless in writing signed by the party/parties sought to be charged.

13.    Jurisdiction; Venue. The New York courts (state and federal), only, shall have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in New York County, and not elsewhere. If any part of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, it shall not affect the validity of the balance of this Agreement. The prevailing party in any such action shall be entitled to reimbursement of its actual costs and attorneys fees. Administrator may, in its sole discretion assign this Agreement or any part hereof to any person, firm or corporation. Owner may not assign this Agreement or any part hereof without the prior written consent of Administrator.

14.    Notice. Any notice, accounting or payment which either party hereto is required or desires to give to the other party shall be addressed to the respective addresses first written above or to such other address as either party shall designate in writing to the other party from time to time. All notices, except for accounting statements furnished by Administrator hereunder shall be sent by overnight courier or by certified or registered mail, return receipt requested and the day of mailing or transmitting of any such notice shall be deemed the date of the giving thereof. A courtesy copy of all notices to Administrator shall be sent to. A copy of all notices to Administrator shall be sent in accordance with the provisions of this paragraph to Administrator's affiliate, Ultra International Music Publishing LLC, 235 West 23rd Street, New York, NY 10011, USA, marked for the attention of the Head of Business & Legal Affairs. Courtesy copies of all notices to be sent to Owner shall simultaneously be sent to c/o Minter & Associates, L.L.C., 5398 East Mountain Street, Stone Mountain, Georgia 30083, Attn: Kendall A. Minter, Esq. provided that an inadvertent failure to send such courtesy notice shall not be deemed a breach hereof.

15.    Legal Counsel. Owner hereby warrants and represents that Owner has retained and/or has had the opportunity to retain independent legal counsel in connection with the negotiation of this Agreement; that Owner has read this Agreement and understands it; and that Owner enters into this Agreement intending to be bound hereby.

10

16.    Cure. No breach of this Agreement on the part of Administrator shall be deemed material unless Owner shall have given Administrator specific written notice of such alleged breach and Administrator shall fail to cure such breach, if any, within thirty (30) days after receipt of such notice. It is further agreed that Owner's rights and remedies in the event of a breach or alleged breach by Administrator of this Agreement shall be limited to Owner's rights, if any, to recover damages in an action at law, and in no event shall Owner be entitled by reason of any such breach or alleged breach to terminate this Agreement or to enjoin or restrain the exploitation by Administrator of the Administered Compositions or the exercise of any rights granted hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

Ultra Music Publishing Europe AG
("Administrator")

By: _____

By: _____
Philip Thomas
Performing Rights Society: BMI
CAE/IPI #:

11

Schedule "A"

| Composition(s) | Writer(s) | Publisher(s) | % Controlled |
|---|---|---|---|
| [TBC] | | | |

Exhibit "A" to that certain agreement dated as of July 18thth, 2018 by and between Philip Thomas p/k/a "Cutty Ranks" both individually and on behalf of his publishing designee (BMI) -with- Ultra Music Publishing Europe AG (hereinafter referred to as "Publisher").

Dated as of: July 18th, 2018

Re:    Notice of Assignment of Administration Rights

Ladies and Gentlemen:

Please be advised that we have entered into an exclusive administration and collection agreement with Ultra Music Publishing Europe AG ("Ultra") with respect to certain musical compositions and portions thereof which are owned or controlled by us (hereinafter collectively referred to as the "Administered Compositions"), as listed on the attached Schedule "A".

Accordingly, from and after January 1st 2019, you are hereby authorized and directed to address all correspondence, inquiries, royalty statements and payments (regardless of when such monies were earned) in respect of the Administered Compositions to Ultra, at the following address:

C/o Sony Music Entertainment, Letzigraben 89 CH – 8003, Zurich, Switzerland

This authorization shall remain in full force and effect until modified or terminated by the undersigned and by Ultra.

Very truly yours,

By: _____
Philip Thomas and on behalf of his
publishing designee
(BMI)

13

Exhibit "B" to that to that certain agreement dated as of July 18th, 2018 by and between Philip Thomas both individually and on behalf of its publishing designee (BMI) -with- Ultra Music Publishing Europe AG.

14

# LETTER OF DIRECTION

From:         Philip Thomas p/k/a "Cutty Ranks"


To:           Jack Russell Music Limited
              21 Harbord Street
              Fulham
              London SW6 6PL
              United Kingdom

Date:   18ᵗʰ July 2018


Dear Sirs,

1.     I refer to the agreement made between you and me dated 1ˢᵗ January 2010, as the same may have been amended ("the Agreement").

2.     I hereby request(s) and irrevocably authorize and direct that you pay to Ultra Records, LLC ("Ultra") all sums (including without limitation advances and royalties) payable to me under the Agreement.

3.     Such aforesaid payment to Ultra shall become payable by you solely in accordance with this authorization at the same time as monies are paid through to me.

4.     Your compliance with this authorization will constitute an accommodation to me; Ultra is not a beneficiary of it.   All payments to Ultra, under this authorization will constitute payment to me and you will have no liability whatsoever by reason of any erroneous payment or failure to comply with this authorization.

5.     All monies becoming payable under this authorization will be remitted to Ultra at the following address or otherwise as Ultra directs you in writing:

Ultra Records, LLC
235 West 23ʳᵈ Street, 6ᵗʰ Floor
New York, NY 10011
USA

Bank Account Details:
Ultra Music Publishing Europe AG
Credit Suisse
Uraniastrasse 4, 8070 Zürich, Switzerland
GBP-corporate account 0879-1282945-42-1
IBAN No: CH92 0483 5128 2945 4200 1

15

Swift Code/BIC: CRESCHZZ80A

and will be accompanied by statements with respect to those payments.


Yours faithfully,

Philip Thomas

Accepted and agreed to

Jack Russell Music Limited


By:_____
(authorized signatory)

16

# Cutty Ranks -w- Ultra Music Publishing

# Co-Publishing Agreement

CO-PUBLISHING AGREEMENT (the "Agreement"), made as of this 18th day of July, 2018 by and Philip Thomas p/k/a "Cutty Ranks" and his affiliated publishing designee (BMI), having an address 5 Wickham Drive, Kingston 8, St. Andrew, Jamaica, West Indies (hereinafter referred to as "Writer") -with- Ultra Music Publishing Europe AG, having an address at C/o Sony Music Entertainment, Letzigraben 89 CH – 8003, Zurich, Switzerland (hereinafter referred to as "Publisher").

WHEREAS, Writer owns and/or controls the copyrights and all other rights in certain musical compositions as more particularly set forth herein; and

WHEREAS, Publisher is engaged in the business of music publishing or is in a position to arrange for music publishing in the Territory (as defined below).

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties hereinafter made by the parties hereto, Writer and Publisher hereby agree as follows:

1.    Rights Granted.

(a)    With effect from 1st January 2021 (the "Effective Date") Writer hereby irrevocably and absolutely assigns, conveys and grants to Publisher, its successors and assigns, an undivided fifty percent (50%) of all of Writer's right, title and interest (including without limitation any ownership, control and administration interest) (Writer's right, title and interest as aforesaid hereinafter defined as "Writer's Interest") in and to to those musical compositions set forth on Schedule "A" (and any and all versions, adaptations and derivatives thereof) attached hereto and made a part hereof, including but not limited to the titles, lyrics and music of each such musical composition and all worldwide copyrights therein and renewals and extensions thereof under any present or future laws throughout the Territory in perpetuity.  Such musical compositions are hereinafter referred to as "Compositions" and each as a "Composition." Writer hereby represents and warrants that no royalties or other sums have been paid to or on behalf of Writer in respect of the Compositions set forth on Schedule "A" as of the date hereof and that mechanical royalties for such Compositions shall be collectible by Publisher for the United States and Canada at not less than seventy-five percent (75%) (prorated by Writer's Interest in each case) of the prevailing statutory per selection mechanical rate in the applicable territory.

(b)    With effect form the Effective Date, Writer hereby irrevocably assigns, conveys and grants to Publisher, its successors and assigns, for the period commencing on the date hereof and continuing in perpetuity the sole and exclusive perpetual rights of administration, collection, promotion and enforcement throughout the Territory in and to one hundred percent (100%) of Writer's Interest in and to each Composition hereunder (including, without limitation, Writer's retained share of the copyright in the Compositions), such rights including, without limitation:

(i)    The exclusive right to perform and license others to perform the Compositions publicly or privately, for profit or otherwise, by means of public or private performance, radio broadcast, television, or by any other means or media, whether now known or hereafter devised, and to collect all royalties and fees payable by reason thereof;

(ii)    The exclusive right to make or cause to be made, and to license other Persons to make, phonograph records, master recordings, transcriptions, soundtracks, pressings and any other mechanical, electrical, digital or other reproductions of the Compositions, in whole or in part (including the right, subject to prior written consent of Writer, to grant licenses to other Persons authorizing so-called "sampling" and/or interpolation of the Compositions), and to use, manufacture, advertise, market, license, sell, or otherwise exploit such reproductions for any and all purposes, including, without limitation, private and public performances, radio broadcast, television, motion pictures, phonograph records, exploitations via the Internet, wireless networks and any and all other means and devices whether now known of hereafter devised, and to collect all monies (including, without limitation, royalties, advances and fees) payable in connection therewith. Without limiting the foregoing, Publisher shall be entitled to grant reduced rate mechanical licenses to record companies in accordance with so-called "Controlled Compositions" clauses provided that Publisher shall not, without Writer's prior written consent, grant any Person a mechanical license at less than seventy-five percent (75%) of the prevailing minimum statutory rate in the territory concerned, and with "caps" in place of less than ten (10) musical compositions per full length album;

(iii)    (A) Subject to reasonable consultation with Writer, the exclusive right to grant worldwide (or lesser territory) licenses for the recording and synchronization of the Compositions, for any and all purposes, in any and all audiovisual works and devices, including, without limitation, motion pictures, TV programs, films, videos and commercials and any and all other means and devices, whether now known or hereafter devised, and to collect all monies payable by reason thereof;

(B)    Notwithstanding the foregoing, Publisher agrees to obtain Writer's written consent prior to embodying Compositions in paid political or religious advertisements, advertisements promoting tobacco, firearm, ammunition products, personal hygiene products or enhancement products, or any audiovisual work which has been or is expected to be rated "NC-17" by any duly authorized regulatory body having jurisdiction over such matters (e.g., MPAA).

(iv)    The exclusive right to print, publish, sell and multiply, and to authorize other Persons to print, publish, sell and multiply, copies of the Compositions in all forms, including, without limitation, sheet music, orchestrations, arrangements and other editions of the Compositions, separately or together with other musical compositions, including, without limitation, in song folios, compilations, song books, mixed folios, personality folios and lyric magazines, with or without music, and to collect all monies payable by reason thereof;

(v)    The exclusive right to make or authorize other Persons to make any arrangement, adaptation, translation, dramatization or transposition of any of the Compositions or of the titles, lyrics, or music thereof, in whole or in part, and in connection with any other musical, literary or dramatic material, and to prepare or authorize derivative works based on the Compositions, regardless of any so-called "moral rights," or similar rights, and to collect all monies payable by reason thereof. Publisher will not make or authorize any material changes to any Composition without Writer's prior written approval (excluding faithful

2

translations and the authorization of remixed versions of Compositions which do not alter the fundamental character of the applicable Composition);

(vi)    The exclusive right to secure copyright registration and protection of the Compositions in Publisher's and Writer's names, including any and all renewals and extensions of such copyright under any present or future laws throughout the Territory, and to have and to hold said copyrights, renewals and extensions and all rights existing thereunder for and during the full term of said copyrights and all renewals and extensions thereof. Writer shall execute and deliver to Publisher copyright assignments, authorizations and directions for Writer's Interest in and to each of the Compositions, such assignments, authorizations and directions to be in the form of Exhibit "A", attached and made a part of this Agreement;

(vii)    The exclusive right to sublicense any or all of the rights granted herein to any Person;

(viii)    The exclusive right to collect all monies derived from the exploitation of the Compositions from any and all sources, including both the so-called publisher's share and the writer's share of such monies (excluding only the writer's share of public performance income which may be paid directly to the writers of the Compositions); and

(ix)    All other rights of exploitation, administration, promotion and collection in and to the Compositions and each of them.

(c)    Writer hereby grants to Publisher the right to use the name, Writer approved likeness and Writer approved biographical material of Writer (including without limitation the name "Cutty Ranks") in connection with the use, promotion and exploitation of Compositions hereunder.

(d)    Writer warrants and represents that it has the right to grant to Publisher all of the rights set forth above with respect to the Compositions.

(e)    Writer warrants and represents that any sale, assignment, transfer, or other grant of rights in or to Writer's Interest in the Compositions shall be subject to Publisher's rights hereunder and the terms and conditions hereof.

(f)    (i)    Notwithstanding anything contained herein, during the sixty (60) day period following the date which is ten (10) years following the Effective Date or, if later, the date on which Writer's account hereunder fully recoups as shown by a statement rendered to Writer, Writer may notify Publisher of Writer's desire that administration rights in Writer's retained share of the copyright in the Compositions revert to Writer on a prospective basis. Such administration rights will automatically revert to Writer as of the end of the quarter-annual accounting period in which Writer's notice is received by Publisher ("Reversion Date") and Writer shall be entitled to collect one hundred percent (100%) of the so-called "writer's share" of income generated by the Compositions, and fifty percent (50%) of the "publisher's share" of such income. Publisher's copyright and administration rights (and all other rights hereunder) in and to Publisher's share of each Composition shall be unaffected by such reversion and Publisher

3

shall have the right to collect and retain for its own account fifty percent (50%) of the so-called "publisher's share" of income generated by the Compositions. Without limiting the foregoing, if as of the date which is ten (10) years following the date of the termination or expiration of the Term hereunder Writer's account hereunder is unrecouped (as shown by the last statement delivered to Writer) Writer shall have the option within six (6) months or the rendition of the next semi-annual statement to Writer, whichever is later, to repay to Publisher an amount representing one hundred and twenty-five percent (125%) of such unrecouped balance and, following the receipt in cleared funds of such repayment by Publisher, Writer's account shall be deemed recouped for the purposes of this subparagraph 1(f)(i).

(ii)    Publisher shall have the right, for twelve (12) months with respect to the United States and eighteen (18) months for the remainder of the Territory, following the commencement of Writer's co-administration rights with respect to the Compositions, as set forth above, to collect all income (excluding Writer's share of performance royalties) earned by the Compositions prior to the Reversion Date but not collected prior thereto ("Post Co-Administration Collection Period") and such income shall constitute gross income hereunder and shall be processed and paid pursuant to the terms of this Agreement. Any income originating from a quote issued by Publisher with respect to a Composition prior to the commencement of Writer's co-administration rights shall be deemed to have been earned prior to the Reversion Date. Notwithstanding the foregoing, following the Reversion Date, Publisher shall have no further obligation or right to collect and/or pay to Writer any monies attributable to the Compositions; provided, however, if, after the Reversion Date any third party debits Publisher's account for an overpayment of income in respect of the Compositions (and Publisher had theretofore accounted to Writer for such income), the amount of the debit, less Publisher's share of such income, shall be considered an overpayment to Writer and at Publisher's election, shall be promptly paid back to Publisher by Writer upon written demand or deducted from any payments due or thereafter becoming due to Writer.

2.    Intentionally Deleted

3.    Advances.

(a)    As an advance against any and all sums otherwise payable to Writer pursuant to this Agreement, Publisher shall pay to Writer the total aggregate sum of Seventy-Five Thousand Dollars ($75,000), such advance to be payable as follows: within fourteen (14) days following the later of: (w) the full execution of this Agreement (and completion of all Exhibits and Schedules), (x) fulfilment of Writer's obligations under subparagraph 2(b) of the separate administration agreement between the parties of today's date (the "Administration Agreement") (including without limitation acceptance by Jack Russell of the applicable letter of direction as set forth in Exhibit B of the Administration Agreement); and (y) Publisher's receipt of an invoice from Writer, and (z) Publisher's confirmation that neither Writer nor any third party on behalf of Writer has collected or been paid any mechanical royalties prior to the date hereof in respect of Writer's Interest in the Compositions set forth on Schedule "A".

(b)    Provided that Writer is not in material breach of any of Writer's obligations, warranties or representations hereunder, in the event that:

4

(i)     Writer's account hereunder fully recoups within twenty-four (24) months of the date hereof (as demonstrated by a statement rendered to Writer hereunder) (the "Recoupment Event"), Writer shall be entitled to request within thirty (30) days of the Recoupment Event the payment by Publisher of a further advance of fifty thousand dollars ($50,000), which advance shall be fully recoupable from royalties payable to Writer hereunder; and

(ii)     Following the date which is twenty-four (24) months of the date hereof Writer's account hereunder fully recoups within eighteen (18) months thereafter (i.e. within forty-two (42) months of the date hereof), including without limitation the recoupment of any additional advance paid under subparagraph 3(b)(i)) (as demonstrated by a statement rendered to Writer hereunder) (the "Additional Recoupment Event"), Writer shall be entitled to request within thirty (30) days of the Additional Recoupment Event the payment by Publisher of a further advance of fifty thousand dollars ($50,000), which advance shall be fully recoupable from royalties payable to Writer hereunder.

(c)     Writer hereby irrevocably requests and authorizes Publisher to pay to Minter & Associates the sum of Five Thousand Dollars ($5,000) for legal services provided, such sum to be paid at the same time Writer is paid the "execution advance" under subparagraph 3(a) above and which sum shall be payable in addition to the "execution advance" payable to Writer hereunder and shall be fully recoupable form royalties payable to Writer hereunder. Publisher's compliance with this authorization will constitute an accommodation to Writer alone and nothing contained herein shall constitute Writer's attorney as a beneficiary of, or party to, this Agreement (or any other agreement between Publisher and Writer). All payments to Writer's attorney hereunder will constitute payment to Writer and Publisher will have no liability by reason of any erroneous payment it may make or failure to comply with this authorization.

(d)     The parties acknowledge and agree that all advance and recoupable sums hereunder shall, in addition to being fully recoupable form royalties payable to Writer hereunder, be fully cross-collateralized and recoupable from all royalties payable to Writer under the Administration Agreement.

4.     Royalties.

(a)     In consideration of the rights granted to Publisher herein, Publisher shall pay or credit the following royalties to Writer with respect to the exploitation of the Compositions (and Publisher shall recoup any advances and chargeable costs paid to or on behalf of Writer hereunder from such royalties):

(i)     Seventy-five percent (75%) of all Net Sums (as hereinafter defined) received by Publisher under any mechanical, transcription, print or other license (other than in respect of public performance rights, directly procured covers and synchronization rights) in respect of the Compositions, or from any other source (excluding performing rights organizations) in respect of the exploitation of the Compositions.

(ii)     Sixty-five percent (65%) of all Net Sums received by Publisher with respect to any Covers in respect of the Compositions. The term "Cover Recordings" means: (i) a recording of a Composition which does not feature Writer as a lead vocalist, featured musician or producer where Writer is credited as such but excluding the first exploited recording (i.e. mechanical reproduction) of such Composition; and/or (ii) recordings of Compositions which have arisen from Publisher and/or any of its sub-publishers directly and identifiably introducing Writer to any artist, group, producer, writer or composer to the extent of the Compositions co-written with any of the aforesaid at the writing session and/or relating to the project in each case the subject of the introduction; and/or (iii) recordings procured by Publisher or its affiliates (i.e. pitched and placed with an artist other than Writer).

(iii)     Sixty-five percent (65%) of all Net Sums received by Publisher with respect to any synchronization licenses in respect of the Compositions.

(iv)     Fifty percent (50%) of all Net Sums received by Publisher comprising the "publisher's share" of public performance income in respect of the Compositions reducing to twenty percent (20%) of any Net Sums comprising the "publisher's share" of public performance income in respect of public performance in respect of Cover Recordings.

(v)     Seventy percent (70%) of all Net Sums received by the Publisher and relating to the exploitation of Compositions hereunder not covered by subparagraph 4(a)(i) to (iv) above.

(vi)     As used in this paragraph 4, "Net Sums" shall mean all royalties actually received by Publisher in Switzerland or the United States (or which are credited against an advance previously paid to Publisher) which are directly and identifiably attributable to the exploitation of the Compositions, less all costs incurred in connection with the exploitation of the Compositions, including, without limitation, all costs of collection (pro-rated to the extent applicable in the event such collection costs do not solely pertain to the Compositions), copyright registration, the costs of printing, arranging, editing, exploiting and selling printed editions of the Compositions, any taxes required to be deducted, any collection or other society charges, and any sums paid or owed to third party subpublishers, licensing agents, arrangers, adaptors or translators of the Compositions. Publisher's overhead costs are excluded. Notwithstanding the foregoing, Publisher confirms that there will be no subpublishing deduction for territories where it is not represented by a local third party sub-publisher or administrator (currently Austria, Switzerland, Canada and the United States and in  which territories royalties payable to Writer shall be calculated on an "at source" basis), and in any other territory where Publisher is represented by a third party subpublisher, administrator or collection agent then the maximum deductions made by such parties shall not exceed ten percent (10%) of the gross local income for mechanical income and twenty percent (20%) of the gross local income for all other exploitations (it being acknowledged that references to "gross local income" shall mean all sums actually collected by Publisher's sub-publishers and administrators less local society deductions and other customary bona fide and actual deductions).

(vii)     All payments to Writer hereunder shall be subject to the deduction or withholding of all taxes required to be deducted or withheld under the laws of any country or

6

territory and to the exchange control regulations of any country or territory from which the relevant monies are derived.

(b)    Publisher shall be under no obligation to pay any other sums whatsoever in connection with the Compositions, except as set forth in this Agreement, and no royalties shall be paid on any complimentary copies of the Compositions, copies of the Compositions sold but not paid for, copies of the Compositions sold and returned to Publisher or copies of the Compositions sold or given away as new issues or for advertising purposes.

(c)    In the event that Writer shall receive directly any sums that should have been paid to Publisher pursuant to the terms hereof, Writer shall hold such amounts in trust for the benefit of Publisher and shall remit to Publisher such amounts (together with all accompanying accounting statements) within ten (10) days after receipt thereof.

(d)    In no event shall Writer be entitled to share in any advance payments, guarantee payments or minimum royalty payments which Publisher may receive in connection with any subpublishing agreement, collection agreement, licensing agreement or other agreement with respect to the Compositions. Notwithstanding the foregoing, in the event that such advance, guarantee payment or minimum royalty payment is solely and expressly attributable to the Compositions hereunder, Publisher will credit Writer its pro rata share in accordance with subparagraph 4(a) above.

(e)    Publisher shall be entitled to collect all monies payable with respect to the Compositions including monies earned but not paid prior to the effective date hereof, which shall include all sums otherwise payable to Writer by Jack Russell Music Limited and subject at all times to the provisions of subparagraph 2(b) of the separate administration agreement between the parties of today's date.

(f)    Subject to subparagraph 4(e) above, If the Publisher or its agent or licensee does not receive in any part of the Territory fifty percent (50%) of the total public performing fees and one hundred (100%) of all other fees and royalties in connection with the use and/or exploitation of the Compositions in the Territory (excluding collection society and society commissions) for any reason other than Publisher's agreement with its sub-publishers/licensees or any act or omission by them, then the proportion of such fees and royalties (including without limitation advances payable hereunder) payable by the Publisher to Writer hereunder shall be correspondingly reduced, so that Publisher shall in any event receive and retain the same proportion of all fees and royalties which the Publisher would have received and retained pursuant to subparagraphs (a)(i) to (a)(v) of this paragraph 4 if Publisher had received fifty percent (50%) of the total public performing fees and one hundred percent (100%) of all other fees and royalties as aforesaid.

5.    Accounting.

(a)    Royalty statements hereunder will be rendered on a semi-annual basis, within ninety (90) days following December 31st and June 30th of each year. Writer shall be entitled to cause a certified public accountant or attorney who is not then currently engaged in an

7

outstanding audit of Publisher, to audit Publisher's books and records insofar as they relate to this Agreement upon reasonable notice to Publisher provided that such examination shall take place at Publisher's offices during normal business hours, not more than once in each calendar year during which Writer receives a statement and at Writer's sole cost and expense. All royalty statements rendered by Publisher to Writer shall be binding upon Writer and not subject to any objection by Writer for any reason unless specific objection, in writing, stating the basis thereof is given to Publisher within three (3) years from the date rendered. Suit shall be commenced on any challenged statement within three (3) years after the date a statement is rendered, after which suit shall be forever barred. Publisher's accounting and payment obligations hereunder may be undertaken and fulfilled by its affiliated entities (including without limitation Ultra International Music Publishing, LLC) subject to Publisher remaining primarily liable.

(b)    Neither Writer nor any Person acting on Writer's behalf shall have the right to commence any examination of Publisher's books and records unless and until such Person engaging in such examination has agreed in writing, that neither the Person engaging in such examination, nor any representatives thereof, shall at any time or in any manner either directly or indirectly, disclose or communicate to any Person, other than Writer or Writer's attorneys or accountants (and such recipients shall also have executed and delivered to Publisher similar agreements), any information acquired from Publisher's books and records during any such examination, or any information of any kind concerning any matters reflecting or relating to Publisher's business or the business of Publisher's affiliated companies obtained through such examination, without regard to whether any or all of such information would otherwise be deemed confidential material, except pursuant to legal process issued in connection with a court proceeding. Writer shall cause Publisher to receive one (1) copy of any audit report prepared as a result of any examination of Publisher's books and records promptly following Writer's receipt of same.

(c)    If Writer or any Person acting for or on behalf of Writer shall commence suit on any controversy or claim concerning royalty accountings rendered hereunder, said claims and the scope of the proceedings shall be limited to determination of the amount of the royalties due for the accounting period(s) concerned, and neither Writer nor any Person acting for or on behalf of Writer shall seek or be entitled to any equitable relief (other than an accounting) or any other relief except recovery of royalties found owing. The recovery of any such royalties shall be the sole remedy available to Writer by reason of any claim related to Publisher's royalty accountings or payments. Without limiting the generality of the foregoing, neither Writer nor any Person acting for or on behalf of Writer shall have any right to seek or obtain termination of this Agreement or of the Term hereof or any injunction against Publisher and/or any Person and/or any other equitable (other than an accounting) relief against Publisher and/or any Person or avoid the performance of Writer's obligations hereunder by reason of any claim relating to Publisher's royalty accountings or payments. The foregoing shall not apply if a court of competent jurisdiction shall find that Publisher has committed fraud with respect to its accountings

6.    Territory.    The "Territory" of this Agreement shall be the Universe.

8

7.    Legal Actions. Any legal action brought by Publisher against any alleged infringer of the Compositions shall be solely initiated and prosecuted by Publisher in consultation with Writer], and if there is any recovery made by Publisher as a result thereof, after deduction of the expense of litigation, including but not limited to reasonable attorneys' fees and court costs (pro-rated to the extent applicable in the event such fees and costs do not solely pertain to the Compositions), a sum equal to Writer's percentage of such net proceeds pursuant to subparagraph 4(a) above (according to income type) shall be paid or credited to Writer.

8.    Force Majeure.    If because of an act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government of governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; or other cause of a similar or different nature not within Publisher's control, Publisher is hampered in the exploitation or administration of musical compositions, then, without limiting Publisher's rights, Publisher shall have the option, by giving Writer notice, to suspend the then-current Contract Period and the Term for the duration of any such contingency plus such additional time as is necessary so that Publisher shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the Option Period provided that any such suspension as a result of a force majeure event shall not continue for longer than six (6) months in any event.

9.    Representations and Warranties; Indemnification.

Writer warrants and represents that:

(a)    The title, lyrics, music and other material comprising the Compositions are and shall be new, original and capable of copyright protection throughout the world, and neither the lyrics, music and titles of the Compositions shall infringe upon any statutory or common law rights of any Person, nor violate any statutory or common law;

(b)    Writer's Interest in the Compositions are and shall be Writer's sole and exclusive property subject only to the terms of this Agreement, free from any adverse claims or rights therein by any other Person whatsoever. There are no agreements of any kind in respect of the Compositions or any right, title or interest therein or the copyright thereof, the existence and terms of which have not been disclosed in writing to Publisher;

(c)    Writer has not heretofore, and shall not hereafter enter into any agreement or perform any act which diminishes, or is inconsistent with, the rights granted to Publisher pursuant to this Agreement; furthermore, Writer warrants that prior to the date hereof neither Writer nor any of Writer's affiliates or any third party publishers or administrators have licensed any of the Compositions nor received or claimed any royalties or fees due in respect of Writer's Interest in the Compositions;

(d)    Writer has and shall continue to have the full right, power and authority to enter into and fully perform this Agreement. Without limiting the foregoing, no consent of any Person is required, nor shall it be required, in order to effectuate the grant of rights made to

9

Publisher under this Agreement, as well as to Publisher's enjoyment of such rights and the proceeds thereof as contemplated hereunder;

(e)    The information set forth in Schedule "A" with respect to the Compositions is accurate in all respects, it being acknowledged and agreed that this representation and warranty is of the essence of this Agreement;

(f)    Writer shall execute any further documents which Publisher may deem necessary or desirable to effectuate the intent and substance of this Agreement. If Writer shall fail or refuse to execute and deliver any such further document(s) within ten (10) business days following the date that Publisher has made such documents available to Writer, Writer hereby appoints Publisher as Writer's true and limited lawful attorney-in-fact solely to execute such document(s) in Writer's name and on Writer's behalf. Such power of attorney is irrevocable and is coupled with an interest. On request Publisher shall supply Writer with a copy of any such documents.

(g)    Writer shall pay all royalties and other payments which may become due to writers, artists, producers and any third party entitled to payment with respect to Writer's Interest in the Compositions. Publisher shall not be required to make any payments of any nature for, or in connection with, the exploitation of the Compositions except as specifically set forth herein.

(h)    Writer hereby warrants and represents that it has not, and that no Person has, prior to the date hereof, sold, assigned, or otherwise transferred or alienated any right, title or interest in or to the Compositions (or any portion thereof).

(i)    Writer warrants, represents and covenants that, promptly following Publisher's request for the same, it will furnish (A) copies of agreements relating to a particular Composition, together with any and all amendments, modifications or renewals to date of any such agreements, and (B) if Publisher deems it reasonably necessary to fulfill its obligations hereunder and/or exercise any of its rights hereunder, copies of all correspondence, files, original documents, royalty records and the like relating to the Compositions.

10.    Indemnity.    Writer shall at all times defend, indemnify and hold harmless Publisher and its affiliates, officers, representatives, agents, licensees and distributors (collectively, the "Other Indemnitees") from and against any and all demands, claims, damages, liabilities, losses, costs and expenses, including legal expenses and reasonable outside counsel fees, arising out of any alleged breach or breach by Writer of any warranty, representation or agreement made herein, or pertaining to any act, error or omission allegedly committed or committed by Writer or any Person allegedly acting on Writer's behalf or under Writer's direction or control. Writer will reimburse Publisher and the Other Indemnitees, on demand, for any payment made at any time after the date hereof in respect of any liability or claim for which Publisher or the Other Indemnitees are entitled to be indemnified provided that the claim concerned has been settled with Writer's prior approval (not to be unreasonably withheld or delayed) or has resulted in an adverse judgment against Publisher and/or the Other Indemnitees by a court of competent jurisdiction. If any claim involving such subject matter has not been

10

resolved, or has been resolved by a judgment or other disposition, which is not adverse to Publisher or the Other Indemnitees, Owner shall reimburse Publisher for fifty percent (50%) of the expenses actually incurred by Publisher and the Other Indemnitees in connection with that claim. Pending the determination of any claim involving any such alleged breach or failure, Publisher may withhold sums due to Writer in an amount reasonably related to such claim, and, pending the determination of the applicable claim(s), Publisher may also elect to suspend the operation of the Term. If no litigation on the claim concerned has been commenced within one (1) year after Publisher is first notified of said claim, Publisher will release any such monies then being held by Publisher by reason of that claim, upon Writer's request, unless Publisher anticipates on reasonable grounds that such litigation may be commenced, or unless active settlement negotiations are in process. Any release by Publisher of monies withheld hereunder shall be without prejudice to Publisher's rights to withhold monies in the future with respect to that claim or any other, if Publisher deems such action to be reasonably necessary. If Writer does not consent to a settlement proposed by Publisher for an amount exceeding ten thousand dollars ($10,000), Writer will nevertheless be required to reimburse Publisher for the full amount paid unless Writer makes bonding arrangements, satisfactory to Publisher in its sole discretion, to assure Publisher of reimbursement for all damages, liabilities, costs and expenses (including reasonable legal expenses and reasonable outside counsel fees) which Publisher may incur as a result of that claim. Writer may participate in the defense of any such claim through counsel of Writer selection at Writer's own expense (and Publisher shall notify Writer of any such claim), but Publisher will have the right at any time, in its sole discretion, to retain or resume control of the conduct of the defense. Notwithstanding anything to the contrary contained in this Agreement, Writer irrevocably consents to the jurisdiction of any Court or other forum in which a claim is asserted against Publisher or the Other Indemnitees which arises out of or relates to any alleged breach or breach by Writer of any warranty, representation or agreement made herein, or any other act, error or omission allegedly committed or omitted by Writer or any person or entity allegedly acting on Writer's behalf or under Writer's direction or control.

      11.    Entire Agreement/Choice of Law/Assignment.    This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. No modification of this Agreement or any provision hereof shall be binding unless in writing signed by the parties sought to be charged. This Agreement shall be construed under the internal laws of the State of New York applicable to contracts to be performed wholly therein. The New York courts (state and federal), only, shall have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in New York County, and not elsewhere. Notwithstanding the foregoing, Publisher reserves the right to pursue a claim and/or initiate proceedings against the Writer hereunder in jurisdictions other than the New York Courts. If any part of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, it shall not affect the validity of the balance of this Agreement. Publisher may, in its sole discretion assign this Agreement or any part hereof to any (i) any parent, subsidiary, division, sister corporation, joint venture partner or affiliate thereof or other affiliate of Publisher; (ii) a person acquiring all or substantially all of the publishing-related assets of Publisher; or (iii) an entity merged or consolidated with Publisher and such rights may be assigned by any assignee. Writer may not assign this contract or any part hereof without the prior written consent of Publisher.

11

12.    Notices.    Any notice, accounting or payment which either party hereto is required or desires to give to the other party shall be addressed to the respective addresses first written above or to such other address as either party shall designate in writing to the other party from time to time.    All notices, except for accounting statements furnished by Publisher hereunder, shall be sent by certified or registered mail, return receipt requested, and the day of mailing of any such notice shall be deemed the date of the giving thereof.    All notices sent to Publisher shall be addressed to the General Counsel. [A copy of all notices to Writer shall be sent to Minter & Associates LLC., 5398 East Mountain Street, Stone Mountain, Georgia 30083 provided that any failure by Publisher to deliver any such courtesy notice shall not be deemed a breach of this Agreement].

13.    Legal Counsel/Binding Agreement. Writer    warrants,    represents    and acknowledges that he has read this agreement, understands it and enters into it intending to be bound hereby, that he has had the opportunity to consult with independent counsel of his choice experienced in entertainment matters in connection with this agreement, and that any failure to do so is knowing and willful; and that this Agreement is the product of an informed negotiation, and as such, it will not be construed against either party as the drafter

14.    Approvals. In the event that Publisher shall require Writer's agreement approval or consent to any action matter or thing hereunder Publisher shall be entitled to serve written notice on Writer (which such notice may be served by email to Writer to jamcutty@gmail.com or such other email address as Writer shall notify Publisher in writing) setting out the action matter or thing in respect of which such agreement approval or consent is required and in the event that Writer shall not within five (5) business days (reducing to three (3) business days for synchronization approvals) after service of such notice have served on Publisher a notice (and email shall constitute sufficient notice) refusing such agreement approval or consent and giving Writer's reasons for such refusal the same shall be deemed to have been given without further formality as if it had been given in writing. Writer shall not unreasonably withhold consent hereunder in relation to any matter requiring Writer's consent or approval (and as a condition to giving any consent or approval, to require improvements to this Agreement, financial or otherwise, shall be deemed unreasonable). Publisher's inadvertent failure to obtain Writer's approval or consent or to consult with Writer in respect of any matter requiring Writer's approval, consent or consultation shall not be deemed a breach of this Agreement. In addition, any approval or consent provided by or consultation with Writer's Manager or representative shall be deemed as if Writer shall have personally been consulted in person or provided such approval or consent (as applicable).

15.    Cure/Remedies.

(a)    Publisher shall not be deemed in breach of any of its obligations hereunder unless Writer shall have given Publisher specific written notice of the nature of such alleged breach and Publisher shall fail to cure such breach, if any, within thirty (30) days after receipt of such notice. It is further agreed that Writer's rights and remedies in the event of a breach or alleged breach by Publisher of this Agreement shall be limited to Writer's rights, if any, to recover damages in an action at law, and in no event shall Writer be entitled by reason of any such breach or alleged breach to terminate this Agreement or to enjoin or restrain the exploitation by Publisher of the

12

Compositions or the exercise of any rights granted hereunder. The limitation of remedy set forth in the immediately preceding sentence shall not apply in the event a court of competent jurisdiction finds that Publisher as committed fraud with respect to its accountings hereunder.

(b)    Writer expressly agrees that the Compositions are of a special unique character and that in the event of a breach by Writer of any term, condition or covenant herein, Publisher shall be entitled to apply for injunctive relief (including, but not limited to, preliminary and/or temporary injunctive relief or restraints against Writer) in addition to any other remedies available to it. Writer shall have the right to contest the facts of any such action or petition.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

Ultra Music Publishing Europe AG ("Publisher")

By: _____

By: _____
Philip Thomas p/k/a "Cutty Ranks", both individually and on behalf of my publishing designee (BMI) ("Writer")

Performing Rights Association Affiliation: BMI
CAE/IPI #:

13

Schedule "A":

<u>INTRODUCCION B - EL COSITA MIX</u>

Rodney Sebastian Clark Donalds      75%
Philip Thomas                       25%

<u>LA CRIPTA REMIXES CUTTY RANKS Y EL CHOMBO</u>

Rodney Sebastian Clark Donalds      75%
Philip Thomas                       25%

<u>NEW VERSION 2018 DAME TU COSITA</u>

Rodney Sebastian Clark Donalds      87.5%
Philip Thomas                       12.5%

COMPLETION IN FULL BY WRITER IS A CONDITION PRECEDENT TO PUBLISHER'S
OBLIGATIONS UNDER THIS AGREEMENT

14

Exhibit "A" to that certain agreement dated as of July 18th, 2018 by and between Philip Thomas both individually and on behalf of his publishing designee (BMI) -with- Ultra Music Publishing Europe AG (hereinafter referred to as "Publisher").

TRANSFER OF COPYRIGHT

Philip Thomas
5 Wickham Drive, Kingston 8, St. Andrew,
Jamaica, West Indies

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Assignor"), individually and on behalf of his publishing designee, heirs, executors, successors and assigns, and with effect from January 1st 2019, hereby irrevocably sells, transfers and assigns to Ultra Music Publishing, Europe AG an undivided fifty (50%) of all of Assignor's right, title and interest in and to (i) all of the musical compositions, or portions thereof, listed on Schedule "A" attached hereto and made a part hereof (hereinafter, the "Compositions"), including, without limitation, the worldwide copyrights (including any renewal or extension of copyrights) therein and thereto; ((ii) any and all licenses, sublicensing agreements, administration agreements, participation agreements, licensing agreements, co-ownership agreements, collection agreements, public performance society agreements, and all other contracts and agreements relating to the Compositions and/or any use or exploitation thereof, and any and all rights and benefits thereunder; and (iv) any and all other rights to and interests in or relating to the Compositions, including, but not limited to, the right to receive income in respect of the Compositions; and (v) an undivided one hundred percent (100%) of the worldwide rights of administration, promotion and collection, including but not limited to the musical compositions listed below:

| Title | Writer(s) | Total |
|-------|-----------|-------|
| See Schedule A | | |

Dated as of: July 18th, 2018

By: _____
Philip Thomas, both individually
and on behalf of my publishing designee (BMI) ("Writer")

15

**PHILIP THOMAS**
a/k/a "Cutty Ranks"
5 Wickham Drive
Kingston 8, St. Andrew
Jamaica, W. I.

1st August 2018

Jack Russell Music Limited
21 Harbord Street
Fulham
London SW6 6PL
England
Attn: Ms. Clare Ram

Re:    **Administration Agreement**

Dear Ms. Clare:

I refer you to the Administration Agreement dated the 1st day of January 2010 between us (the "Agreement").

Please be advised that I hereby elect to terminate the Term of the Agreement, effective as of the 31st day of December 2018. I acknowledge that the "Collection Period" under the Agreement shall continue through the 31st day of December 2020.

Thank you for your service and attention given to me and my music publishing catalog during the past 8½ years.

Best regards.

_____
Phillip Thomas

# EXHIBIT "C"

12



Excellence. Experience. Enthusiasm.

**Catherine Gibson**

Attorney at Law
Licensed in NY and GA

April 22, 2025

**VIA E-MAIL TO: david.schrager@ultrapublishing.com, US MAIL AND
CERTIFIED MAIL 9589071052701985112921**
Ultra International Music Publishing, LLC
c/o David Schrager, Esq.
General Counsel & SVP Business & Legal Affairs
137 W 25TH ST FL 10
NEW YORK, NY 10001-7209

**Re: Co-Publishing Agreement on or about July 18, 2018 between Philip
Thomas p/k/a "Cutty Ranks" and Ultra Music Publishing Group Europe AG
c/o Sony Music Entertainment. Effective Date January 1, 2021**

**Administration Agreement on or about July 18, 20218 between Philip
Thomas a/k/a "Cutty Ranks" and Ultra Music Publishing Group Europe AG
c/o Sony Music Entertainment.  Effective Date January 1, 2021**

<u>**Notice of Default and Demand for Audit**</u>

Dear Mr. Schrager:

Please be formally advised that The Gibson Law Firm, LLC represents Mr. Phillip
Thomas p/k/a "Cutty Ranks" in the above referenced contracts with Ultra Music
Publishing Group Europe AG c/o Sony Music Entertainment.  Pursuant to the
Agreements:

Under the Co-Publishing Agreement, Mr. Thomas is to be paid Seventy-Five
Percent (75%) of all Net Sums received by Publisher received by Publisher under any
mechanical, transcription, print or other license or from any other source, Sixty-Five
Percent (65%) of all Covers, synchronization licenses, Fifty Percent (50%) of all Net
Sums for publisher share of public performances and Seventy Percent (70%) of all Net
Sums for all other compositions.

Under the Administration Agreement, Mr. Thomas is to be paid Eighty-Five
Percent (85%) of all Net Sums received by Publisher received by Publisher under any
mechanical, transcription, print or other license or from any other source, Seventy-Five
Percent (75%) of all Covers, synchronization licenses, Seventy Percent (70%) of all Net

MAIN OFFICE
1126 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
Phone:   404-733-6700
Fax:     404-733-6007
thegibsonlawfirm.com

Real Estate | Personal Injury | Immigration | Civil Litigation | Business Law

NEW YORK OFFICE
11 Broadway, Suite 615
New York, New York 10004
Phone: 646-253-0519
Fax:    212-269-3601
thegibsonlawfirm.com



THE
GIBSON LAW
FIRM. LLC

Excellence. Experience. Enthusiasm.

**Catherine Gibson**

Attorney at Law
Licensed in NY and GA

Sums for publisher share of public performances and Seventy Percent (70%) of all Net Sums for all other compositions.

Mr. Thomas has not received full compensation under these Agreements. Mr. Thomas is hereby demanding full payment within thirty (30) days. Further, pursuant to his right to Audit, Mr. Thomas is seeking to audit the records of Ultra Music Publishing Group through his Certified Public Accountant. We are hereby seeking a time and date for the audit.

Should you have any questions regarding this matter, please contact me.

Very Truly Yours,

Catherine Gibson

cc. Philip Thomas p/k/a "Cutty Ranks" (via electronic delivery only)

MAIN OFFICE
1126 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
Phone: 404-733-6700
Fax:    404-733-6007
thegibsonlawfirm.com

Real Estate | Personal Injury | Immigration  | Civil Litigation | Business Law

NEW YORK OFFICE
11 Broadway, Suite 615
New York, New York 10004
Phone: 646-253-0519
Fax:    212-269-3601
thegibsonlawfirm.com